# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CLAUDE F. GARRETT, | ) | |
| | ) | |
| Petitioner, | ) | No. 3:13-cv-00190 |
| | ) | Senior Judge Haynes |
| v. | ) | |
| | ) | |
| WAYNE CARPENTER, Warden,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Petitioner, Claude F. Garrett, a state prisoner, filed this pro se action under 28 U.S.C. § 2254

seeking the writ of habeas corpus to set aside his conviction for first-degree felony murder for which

he was sentenced to life imprisonment. After an initial review, the Court appointed counsel to

represent Petitioner and an amended petition was filed on June 5, 2013 (Docket Entry No. 12). In

sum, Petitioner's claims in the amended petition are[2]:

Claim 1:     Petitioner is actually innocent of arson and first degree murder, based
upon scientific evidence at his trial and new scientific evidence.

Claim 2:     Alone and cumulatively Petitioner received ineffective assistance of
counsel who failed: (a) to present evidence to discredit the state
scientific expert; (b) to utilize properly defense arson expert Stuart
Bayne; (c) to challenge on direct appeal the factual basis underlying

---

[1]Wayne Carpenter, the current warden of the Riverbend Maximum Security Institution where Petitioner is confined, is substituted for Ronald Colson, the original Respondent. Fed. R. Civ. P. 25(d); Rule 2(a), Rules Governing Section 2254 Cases.

[2]Rule 15 of the Federal Rules of Civil Procedure applies to a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supersede the pro se petition and the claims therein. Unless adopted and supported by legal memorandum, the Court deems the claims in the pro se petition to be waived.

the evidence presented by State's expert witness; (d) to call Dr. Robert Roth as a witness on the burn patterns on the bodies of Petitioner and the victim; (e) to move for a mistrial when after the State's witnesses referred to Petitioner's prior trial; (f) to cross-examine effectively James Cooper and failure to move for an interlocutory appeal on the admission of Cooper's testimony; and (g) to let Petitioner testify at trial.

Claim 3: Petitioner's post-conviction counsel failed to present evidence of the multiple editions of the National Fire Protection Association's Guide for Fire and Explosion Investigations ("NFPA 921") and failed to raise meritorious claims of prior ineffective assistance of counsel that are actionable under Martinez v Ryan, 132 S.Ct. 1309 (2012).

Claim 4: The trial court's admission of the State expert witness testimony violated Petitioner's right under the Due Process Clause of the Fifth and Fourteenth Amendments.

Claim 5: The State's evidence was insufficient to support Petitioner's conviction in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.

Claim 6: At trial, the state prosecutor knowingly presented false testimony in violation of Napue v. Illinois, 360 U.S. 264 (1959).

Claim 7: Petitioner's appellate counsel was ineffective for failing to raise or frame properly meritorious claims, including, but not limited to, the ineffectiveness of trial counsel, and this claim is actionable under Martinez v Ryan, 132 S.Ct. 1309 (2012).

(Docket Entry No. 12, Amended Petition at 3-4).

In his response, Respondent asserts that Petitioner has exhausted his state remedies, but argues that most of Petitioner's federal claims were not fully and fairly presented to state courts and are procedurally barred. For this default, Respondent cites Tennessee's one-petition rule and the one-year statute of limitations for state post-conviction petitions. Tenn. Code Ann. §§ 40-30-102(a), (c). Respondent identifies the following claims as procedurally defaulted:

Claim 1 – Actual innocence of first degree murder, as allegedly established by new

2

scientific evidence.

Claim 2 – Ineffective assistance of counsel.

* * *

C. Counsel failed to challenge on direct appeal the factual basis underlying the evidence presented by James Cooper.

* * *

F. Counsel failed to effectively cross-examine James Cooper during the <u>Daubert</u> hearing, and failed to move for an interlocutory appeal.

G. Counsel failed to allow the petitioner to testify.

H. Cumulative effect of counsel's alleged errors.

Claim 3 – The petitioner received ineffective assistance of counsel during post-conviction proceedings.

A. Counsel failed to move into evidence multiple editions of the National Fire Protection Association's Guide for Fire and Explosion Investigations.

B. Counsel failed to raise meritorious issues of prior ineffective assistance of counsel.

Claim 7 – Ineffective assistance of appellate counsel stemming from counsel's failure to raise meritorious claims including claim of ineffective-assistance of trial counsel.

(Docket Entry No. 20, Response at 4).

In his amended petition, Petitioner requested an evidentiary hearing. (Docket Entry No. 12, Amended Petition at 5). Petitioner, however, has not filed a motion for a hearing to identify the issues for the hearing and the justification for a hearing. Congress redefined the standards for an evidentiary hearing in a habeas action.

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claims relies on - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) **a factual predicate that could not have been**

**previously discovered through the exercise of due diligence; and**

**(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.**

28 U.S.C.§ 2254(e)(2) (emphasis added).

In <u>Williams v. Taylor</u>, 529 U.S. 420 (2000), the Supreme Court explained that if the petitioner demonstrated diligence, then the inquiry ends, but if there is an issue of diligence, the focus is on whether the petitioner or his counsel knew of the matters at issue and failed to pursue the matter:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. . . . **Diligence for purposes of the opening clause [on Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court;** it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.
>
> *　*　*
>
> **For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.**
>
> *　*　*
>
> Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).
>
> **As we hold there was a failure to develop the factual basis of this <u>Brady</u> claim in state court, we must determine if the requirements in the balance of § 2254(e)(2) are satisfied so that petitioner's failure is excused . . . upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found petitioner guilty of capital murder but for the alleged constitutional error.**

4

529 U.S. at 435, 437, 439-40.

Later, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> **In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it.** See <u>Yarborough v. Gentry</u>, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); <u>cf</u>. <u>Bell v. Cone</u>, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

<u>Holland v. Jackson</u>, 542 U.S. 649, 652 (2004) (emphasis added).

Independent of § 2254(e)(2), the Court also has the inherent authority to set an evidentiary hearing in a habeas action. <u>Abdur' Rahman v. Bell</u>, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." <u>Id.</u> at 705. Such hearings are set "to settle disputed issues of material fact." <u>Id.</u> at 706. Yet, "if [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and ordinarily should accept the facts as found in the hearing. But [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." <u>Id.</u> at 705 (quoting <u>Townsend v. Sain</u>, 372 U.S. 293, 318 (1963)). This authority extends to determine factual issues or if an inadequate record exists to resolve the petitioner's claims, on a procedural default controversy. <u>Alcorn v. Smith</u>, 781 F.2d 58, 60 (6th Cir. 1986).

Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Kenney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order a hearing is "when a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent discretion to order a hearing is still intact following Williams." Abdur' Rahman, 226 F.3d at 706. Evidentiary hearings have been held to be appropriately denied where the habeas petitioner "has not shown that his . . . claims would result in no reasonable factfinder finding him guilty of the underlying offenses . . . We therefore conclude that the district court did not abuse its discretion by declining to conduct an evidentiary hearing." Abdus-Samad v. Bell, 420 F.3d 614, 626-27 (6th Cir. 2005). See also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.") Yet, the Sixth Circuit has since explained that Pinholster "was not a wholesale bar on federal evidentiary hearings . . . such as when the State court decision was not an adjudication on the merits." McClellan v. Rapelje, 703 F.3d 344, 356 (6th Cir. 2013).

Given Petitioner's trial and two post-conviction hearings, the Court deems the state record adequate to decide Petitioner's claims. Petitioner has not carried his burden to justify another evidentiary hearing.

## A. Review of the State Record

### 1. Procedural History

A state court jury convicted Petitioner of first-degree felony murder, for which he received a life sentence. State v. Garrett, No. 01C01-9403-CR-00081, 1996 WL 38105, at *1 (Tenn. Ct.

Crim. App. Feb. 1, 1996). On direct appeal, the Tennessee Court of Criminal Appeals affirmed the petitioner's conviction and sentence. Id. at *9.

Petitioner filed his first state post-conviction petition that the trial court denied, but on appeal, the Tennessee Court of Criminal Appeals reversed and remanded for further proceedings. Garrett v. State, No. 01Col-9807-CR-00294, 1999 WL 436828, at *1 (Tenn. Ct. Crim. App. June 30, 1999). After remand, the state trial court denied post-conviction relief, and in the second appeal the Tennessee Court of Criminal Appeals reversed, set aside Petitioner's conviction and ordered a new trial. Garrett v. State, No. M1999-00786-CCA-R3-PC, 2001 WL 280145, at *1 (Tenn. Ct. Crim. App. Mar. 22, 2001).

After a retrial, a jury convicted Petitioner of first-degree felony murder for which he received a life sentence. State v. Garrett, No. M2004-02089-CCA-R3-CD, 2005 WL 3262933 at *1 (Tenn. Ct. Crim. App. Dec. 1, 2005). On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction and sentence. Id. The Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id. Petitioner did not seek review by the United States Supreme Court.

Petitioner filed his second state post-conviction petition that the state trial court denied and on appeal, the Tennessee Court of Criminal Appeals affirmed. Garrett v. State, No. M2011-00333-CCA-R3-PC, 2012 WL 3834898 at *1, *70 (Tenn. Crim. App. Sept. 5, 2012). On February 25, 2013, the Tennessee Supreme Court denied Petitioner's application for discretionary review. Id.

## 2. Review of the State Court Findings

On Petitioner's second direct appeal, the Tennessee Court of Criminal Appeals initially

addressed two pretrial motions on lost evidence and admission of the State's expert testimony.

Prior to the second trial, the court held an evidentiary hearing upon the defendant's motion to dismiss the indictment. In his motion, the defendant claimed that the state had lost or destroyed physical evidence, including crime-scene photographs. In the hearing, a Tennessee Bureau of Investigation (TBI) forensic analyst testified that she analyzed material samples taken from the burned house by fire investigator Kenneth Porter, including soil from under the house, liquid from the driveway, wood from the floor inside the front door, and a ten-gallon plastic container outside the house. She also analyzed material samples submitted by Metro police detective David Miller. Her analysis was designed to determine the presence of any petroleum distillate in the samples.

Investigator Porter testified in the hearing that he took the samples of soil and of wood from the floor near the front door because he thought that the floor in that area of the house was the point of origin of the fire. He delivered his samples to, and retrieved them from, the TBI laboratory. Later, following the defendant's conviction in his first trial, Mr. Porter destroyed the samples. *FN1*

> *FN1.* James Cooper, an agent of the Federal Bureau of Alcohol, Tobacco, and Firearms, testified in the hearing that the Metro police department asked him to assist them in the investigation of the fire that caused the victim's death. He collected some material samples from the floor beneath the baseboard of the front room in the house. We glean from the evidence presented at trial that Agent Cooper's collected samples were given to Detective Miller and that these samples were the ones delivered to the TBI laboratory by Detective Miller. Apparently, the Cooper/Miller samples yielded positive test results for petroleum distillates while the Porter samples yielded negative results. The Cooper/Miller samples were not destroyed and were presented as evidence in the trial now under review.

Regina Draper, an investigator with the district attorney general's office, testified in the hearing that, in August 1993, she checked out 38 crime-scene photograph negatives from the police property room, delivered them to an assistant district attorney general, and did not take them back to the police department. She testified that the negatives were not in the district attorney general's file and that she had no knowledge of their whereabouts.

**Following the hearing, the trial court ruled that the presence of Mr. Porter's physical samples were unnecessary to assuring a fair trial because the defendant could rely upon laboratory analysis of the samples that showed that they contained no petroleum distillates. The trial court opined that the defendant**

8

**failed to establish that the photograph negatives were not the negatives of photographs introduced into evidence in the defendant's first trial and that he, therefore, failed to show that they were unavailable**.

Also, prior to the second trial, the court conducted a hearing upon the defendant's challenge of Agent James Cooper as an expert witness on the cause of the fatal fire in the present case. **In the hearing, Agent Cooper testified about his background and training as an arson investigator, and the trial court ruled that the witness was qualified to render his opinion on the origin of the fire.**

2005 WL 3262933 at *1-2 (emphasis added).

The Tennessee appellate court then set forth its lengthy findings of the facts underlying Petitioner's conviction.

The conviction results from a charge that, in the early-morning hours of February 24, 1992, the defendant started a fire in the Davidson County home in which he and the 24-year-old victim, Lori Lance, were residing. After the firefighters' entry into the smoldering house, they found the victim lying prone in a utility room in the rear of the small house. The utility room door was closed, and the victim lay under an aluminum lawn chair and some toys. The victim died of smoke and gas inhalation.

\* \* \*

The defendant's second trial began on July 21, 2003. The victim's mother, Sandra Lee Jones, testified that she was concerned about the victim's safety in the house that she occupied with the defendant because the house had no rear exit and was heated by a kerosene heater. Ms. Jones explained that, years before the victim's death, she and her family had witnessed a fire in their neighborhood that had killed a child, and as a result, Ms. Jones had stressed fire safety to her family, including the victim. She testified that the victim had installed a smoke alarm in the kitchen, and Ms. Jones noticed the alarm on the kitchen wall three days before the fire. Ms. Jones testified that the victim had bought a fire extinguisher a week before the fire. She testified that, when she went to the hospital following the fire, the defendant held up his bandaged hands to her, said he was burnt, and said nothing about the victim. On cross-examination, Ms. Jones testified that she did not recall whether the victim had said anything about the defendant painting the kitchen, but Ms. Jones did recall seeing paint buckets in the kitchen three days before the fire.

Michael Alcorn testified that he lived across the street from the victim and the defendant. On the morning of February 24, 1992, his wife woke him and told him that the house across the street was on fire. Mr. Alcorn testified that he put on trousers and ran across the street. He testified, "I noticed Mr. Garrett stumped [sic]

down by a tree when I first came out." The defendant was 25 or 30 feet away from the burning house. Mr. Alcorn testified that, when he crossed the street, the defendant jumped up, grabbed a lawn chair, started to break the windows on the side of the house, and hollered for the victim. The defendant broke out each bedroom window and then began striking the plywood that covered the bathroom window with an axe. The defendant then began spraying the front room with a garden hose. Mr. Alcorn opined that the first fire truck arrived within five to ten minutes. The firefighters extracted the victim from the house and placed her in an ambulance.

The defendant was in the Alcorn home when Mr. Alcorn returned from work at 5:30 or 6:00 p.m. on February 24, 1992. Mr. Alcorn testified that his wife informed him that the victim had died. The defendant spent the night in a car in the Alcorns' yard, and Mr. Alcorn saw him the next morning. Mr. Alcorn testified that the defendant never mentioned the victim in Mr. Alcorn's presence.

On cross-examination, Mr. Alcorn disagreed that during and following the firefight the defendant was in a state of panic. Although the defendant screamed "Lori" at each window, Mr. Alcorn opined that the defendant's emotional state was "so-so." Mr. Alcorn agreed that the defendant had burns on his hand and that his facial hair was singed. Mr. Alcorn had smelled alcohol on the defendant but could not say that the defendant was intoxicated. Mr. Alcorn acknowledged that, in his prior statement, he did not mention the defendant's squatting beside the tree.

Bobby Alcorn, Michael Alcorn's son, testified that he was 17 years old at the time of the fire. At approximately 5:00 on the morning of February 24, 1992, he was preparing to go to school and heard his dog barking and a "kind of bang" that sounded "like a shotgun." Within a few minutes, he heard his mother screaming that the defendant's house was on fire. He looked across the street, saw the fire, and saw the defendant "kind of squatted down by a tree." Bobby Alcorn testified that when his father ran across the street, the defendant rose, took a lawn chair, and broke a window in the house. The defendant used an axe to attack the plywood covering on the bathroom window before giving the axe to Bobby Alcorn. Bobby Alcorn overheard the defendant telling Michael Alcorn that he did not believe the victim would have gone to the utility room.

Bobby Alcorn stayed home from school that day to be with his mother, who was distraught about the fire and the victim's death. During the day, he talked with the defendant and attributed the following statement to the defendant:

> ["]I know they think I done it,["] and he was referring to the police. And he said, ["]I know they think I done it. If I would have done it, I'd have to go around back and get a gasoline can, go to the car and syphon it out, and then I'd had to pour it around on the love seat, I

mean on the couch and around the door facing and I would have had to light it.["]

Bobby Alcorn testified that during the day of February 24, the defendant never spoke of the victim; the defendant was "nervous" and "acted different." He testified that the defendant would peep out the windows of the Alcorn home and would retreat to the bathroom if someone turned into the driveway.

On cross-examination, Bobby Alcorn acknowledged that in his prior statement, he did not mention the defendant's squatting beside the tree.

The forensic pathologist who performed an autopsy on the victim testified that the victim died from inhaling smoke and noxious gases, probably succumbing within 10 to 30 minutes after she began to breathe smoke. The victim's blood alcohol level was .06 percent. The physician testified that the victim had burns on her head and left arm and that the burns probably resulted from heat build-up in the utility room where the victim was found. Other than the burns, the victim's body had suffered no other trauma. The physician opined that fire victims will frequently retreat to a room away from the fire and have been known to burrow under objects to protect themselves.

The doctor visited the crime scene and looked at a bar latch on the outside of the utility room door. She testified that the victim was five feet, six inches tall, weighed 135 pounds. She opined that had the victim been inside the utility room with the latch engaged, she should have been able to break through the latch from the inside of the utility room.

Otis Jenkins testified that he was a Metro fire department captain in 1992 and responded to the fire at the victim's and the defendant's house. He "came upon a door that had a locking mechanism of some sort on it, got the door open, [and] went inside." He recalled that the door "resisted" and that he had "to work it." He found the victim in the room behind the door; she was lying on the floor between the washing machine and the wall. On cross-examination, Mr. Jenkins testified that the door was "latched or locked. I don't recall exactly what." He did not recall telling Detective Miller that the door was not latched, maintaining that he had always believed that the door was latched when he discovered it. He testified that although he wore thick gloves, he worked the mechanism on the latch to open the door. Because the alarm on Mr. Jenkins' self-contained breathing unit sounded, he left it to other firefighters to remove the victim. Later, while outside, he saw the defendant try to enter the house before being escorted away by two firefighters.

Terry Nickens, another Metro fire department captain, testified that he arrived at the fire scene at 5:15 a.m. When he heard that a person remained inside the house, he accompanied firefighter Patrick Hunt on a search and rescue mission inside the

house. When the victim was found inside the utility room, Mr. Nickens entered the room. The victim's legs were tangled in tricycles, toys, and other objects. Mr. Nickens and Mr. Hunt carried the victim out of the house at approximately 6:03 a.m. Mr. Nickens noticed that the defendant "[s]eemed rather calm for the situation at hand."

Patrick Hunt testified that he was a firefighter and an emergency medical technician in 1992 when he arrived at the fire scene, where he saw heavy smoke and flames coming from the front door. The defendant approached him and told him that his girlfriend was inside the house. The firefighters were able to "knock down" the fire quickly, and Mr. Hunt began searching for the victim. Before the victim was found, Mr. Hunt's breathing unit became depleted of air, and he returned to the fire truck for a new one. The defendant approached him again and said, "I know where she's at. She's in the back of the house through a door in the kitchen." Mr. Hunt re-entered the house, and he and Mr. Nickens went to the utility room door that Mr. Jenkins had just opened. The victim was lying prone on the floor under a folding chair and some toys. She had no life signs. He opined that he and Mr. Nickens removed the victim at about 5:42 a.m. He recalled that Mr. Jenkins had told him that Jenkins had to unlatch the utility room door. He acknowledged on cross-examination that it is not uncommon for someone being suffocated to retreat and burrow under objects.

Another Metro fire department captain, William McCormick, testified that he supervised the fire scene and did not enter the house. During the firefight and rescue operation, the defendant went to the front of the house and looked into the windows. Mr. McCormick and another firefighter escorted the defendant away from the house. The defendant told Mr. McCormick that the person inside the house was his sister. The defendant was agitated and smelled of alcohol, although his speech was not slurred, and he did not stagger. When the victim was placed in the ambulance, the defendant climbed onto the running board and tried to look inside the ambulance. Mr. McCormick agreed that Mr. Jenkins had told him that the utility room door was latched when he found it.

David Miller testified that he investigated the fire in his capacity as a Metro homicide detective. He and Detective Mike Roland arrived at the scene at 6:20 a.m. on February 24, 1992. After Kenneth Porter told him that the fire was started with an accelerant, Mr. Miller met with the defendant, obtained the defendant's clothing, and requested the defendant to render a hand-swab sample, which the defendant declined.

That evening, after obtaining a search warrant, Mr. Miller accompanied Agent James Cooper in recovering material samples from the burned house. He testified that in the kitchen, they found a bedspread on the floor, lying beneath the refrigerator and "all the way around out towards the [utility room] door." He testified that the bedspread appeared to be soaked in some kind of accelerant, that he could smell an accelerant,

and that he found a plastic container nearly full of what appeared to be kerosene on the floor near the utility room door. He testified that Otis Jenkins had told him that the utility room door was latched. Mr. Miller testified that he tested the latch by going inside the utility room and being unable to push his way out through the door after Agent Cooper experimentally engaged the latch. Mr. Miller acknowledged, however, that he did not "put his shoulder into it." Mr. Miller found a smoke detector lying on either the washer or dryer in the utility room. The detector had neither a covering nor batteries. Mr. Miller testified that Mr. Cooper collected material samples and gave them to him, that he placed them inside airtight metal containers, and that later he delivered them to the TBI laboratory.

Mike Roland testified that, as a homicide detective, he assisted David Miller in investigating the victim's death. He initially interviewed members of the Alcorn family to "get a grasp" of the situation and learned from them that they had heard an explosion and had seen the defendant running around the house yelling and perhaps trying to get into the house. Mr. Miller then interviewed the defendant after the fire and recounted that the defendant said that in the evening before the fire, the defendant and the victim had been out drinking, they returned home, and fell asleep in the living room before retiring to the bedroom. Mr. Roland testified that the defendant told him that he had awakened, smelled smoke, yelled for the victim, and started out of the house. The defendant said that he noticed the victim heading for the kitchen. In a later interview, the defendant told Mr. Roland that he was leading the victim out of the bedroom by the hand when she jerked away and went toward the kitchen. Mr. Roland presented audiotapes and transcripts of the defendant's statements.

On cross-examination, Mr. Roland testified that the victim appeared to have been dressed for bed. He recalled that the defendant's hair was singed and that one hand was bandaged. After the fire, the defendant did not appear to be upset or intoxicated. Mr. Roland acknowledged that before the officers collected evidence on the evening of February 24, the fire department had cleaned the floor in the house with a booster hose. He remembered that water stood in the kitchen floor. When, in reference to a photograph, Mr. Roland was asked about a clean blue cigarette lighter that appeared out of place on the charred dresser in the bedroom, he agreed that someone must have left the lighter there after the fire and that its presence could signify contamination of the crime scene.

The TBI analyst who tested the material samples collected by Kenneth Porter and James Cooper testified that a section of the bedspread and the plastic container from the kitchen, the smoke detector, and living room debris collected from near the front door tested positively for the presence of a kerosene range distillate.*FN2* The defendant's trousers and shirt contained no distillate.*FN3*

FN2. These items had been collected by Mr. Cooper and transported to the laboratory by David Miller

FN3. Apparently, these were the items collected by Mr. Roland, who assisted Mr. Miller in investigating the case

On cross-examination, the TBI analyst testified that she received from Kenneth Porter a soil sample taken from beneath the suspected point of fire origin in the front room floor, a piece of carpet taken from the same location on the front room floor, a ten-gallon plastic can found behind the house, and liquid collected from the driveway. None of these samples contained any chemical distillates. A sample of wood flooring taken by Mr. Porter from beneath the front door sill revealed the presence of terpenes, but the analyst explained that the presence of this chemical probably resulted from the use of wood preservative on the door or the wood floor. The wood samples contained no kerosene range distillate. The analyst acknowledged that kerosene range distillate presence on some of Mr. Miller's samples could have resulted from transference by handling by the officers. She admitted that kerosene could have been present in some of the samples for an extended period of time.

James Cooper testified that he had retired as an agent of the United States Department of Treasury Bureau of Alcohol, Tobacco and Firearms (ATF). As an ATF agent, he had been a certified fire investigator and a fire-cause and origin specialist. Because local authorities had requested that he assist in investigating the fire that killed the victim, he inspected the house on the evening of February 24, after the fire department had washed the flooring with a booster hose. He opined that the washing did not obstruct or hamper his observation of the burn pattern. He concluded that the fire began in the front room. He found no evidence of an electrical or other accidental cause of the fire. A kerosene heater found in the bedroom was not the cause of the fire. He discovered a saturation of kerosene in the kitchen. The utility room door was closed during the fire. Mr. Cooper testified that Otis Jenkins told him that he had "had to use two hands to slide the bolt on the latch to the other side to open the door."

Mr. Cooper testified that he collected material from beneath the baseboard in the front room because liquid spilled in the floor would typically run under a baseboard and because the flooring beneath the baseboard was free of foot traffic occurring during and after the firefight. Also, he found a "V" pattern on the baseboard, which to him was "like a red flag waving at you," indicating an accelerated fire. Mr. Cooper presented a number of pictures and slides of the fire scene. He opined, "[T]his was a deliberately set fire, arson. Somebody went into the house, and their design, their intent, was to spread the fire from the front room to the back where the victim was."

Defense counsel engaged Mr. Cooper in a rigorous cross-examination, during which

14

the witness testified that the kitchen floor contained "[q]uite a bit of water," that a portion of the liquid on the bedspread was water, and that he relied upon Detective Miller's report of his interviews of the firefighters and did not interview them personally other than to talk with Otis Jenkins. Mr. Cooper did not see the house before the booster-hose cleansing and did not see the front-room furniture in its pre-fire position. He insisted, however, that the flooring in the front room evinced a "pour pattern," indicating that a liquid accelerant had been poured in the floor. He admitted that polyester from furniture could melt onto the floor and simulate a pour pattern but maintained that he could distinguish a pour pattern from a polyester meltdown. He admitted that one photograph showed that the latch bar was dark, as if it was coated in carbon, which might indicate that the bar was not inserted into the latch housing during the fire.

Fire investigator Kenneth Porter testified for the defendant. He arrived on the scene of the fire at 6:30 a.m. on February 24, 1992. He determined that the point of origin was in the floor at the front door and that the fire was started via a liquid accelerant. He opined that the pour pattern covered 60 or 75 percent of the front room floor. The bedspread was not mentioned in Mr. Porter's report. He testified that a smell of kerosene in the house could have emanated from the kerosene heater. He collected samples of soil beneath, and carpet from, the front room floor at the suspected point of origin, and he collected a wood sample from under the front door sill. He submitted these samples to the TBI but destroyed them when he retired from the fire marshall's office. He testified that as a means of enhancing his investigation, he had the front room furniture, which had been removed during the firefight, returned to its pre-fire position in the front room. He testified that radiant heat can sometimes simulate a pour pattern on a wood floor.

Ruby Alcorn, the wife of Michael Alcorn, testified that she was awakened on the morning of the fire by a commotion outside "like someone hollering." She did not hear an explosion. She looked outside and saw flames emanating from the front door and window of the house across the street. The defendant was standing by a tree, jumping up and down and screaming, "Lori." Ms. Alcorn yelled for her husband, who got up, donned his trousers, and ran across the street. Her son, Bobby, followed his father. On cross-examination, she testified that the defendant stayed in the Alcorn home during the day of the fire. She attributed to him a statement very similar to that recounted by Bobby Alcorn that the defendant knew the police suspected him of arson, followed by his detailing what he would have had to have done to set the fire. She also agreed that during the day, whenever someone came to the Alcorn home, the defendant would go to the back of the house. At one point, he spent a long time in the bathroom, where he shaved his facial hair, leaving a mess for her to clean up. She opined, "He didn't worry about anybody but himself."

Metro police officer John Murphy testified that he was instructed to secure the fire

scene and arrived at 9:30 a.m. on February 24. He was told to leave-and did leave-at 11:00 or 11:30 a.m. He did not recall whether other officers arrived to secure the scene.

Regina Draper Beene *FN4* testified that in her capacity as an investigator for the district attorney general's office, in August 1993, she obtained 38 negatives of pictures taken by Officer James Goodman. She delivered the negatives to an assistant district attorney general but never retrieved them. She testified that she attempted to locate them but was unable to do so. She agreed that some of the pictures offered into evidence in the defendant's first trial had been taken by James Goodman and could have been produced from any number of the 38 negatives.

> *FN4* By the time of trial, Ms. Draper had married and was identified as Regina Beene.

James Goodman testified that as a Metro police officer he took photographs of the fire scene but never reviewed the photographs.

Betty Satterfield, the defendant's mother, testified that she lived in Kansas in 1992 and that when she learned that the defendant had been burned, she sent for him to come to her home. When he arrived, he had burns on his face and hands.

R.J. Corbin testified that as a firefighter, he arrived on the fire scene at 5:08 a.m. on February 24, 1992. Upon his arrival on the first truck to respond, the defendant hammered on the truck door and said there was a woman inside the house. Mr. Corbin testified that approximately 40 minutes after he arrived, he had to escort the defendant away from the front of the house.

Stewart Bayne testified for the defendant as an expert in fire investigation and fire science. He acknowledged that he did not visit the scene of the fire until after the house had been restored but maintained that he has testified in other cases despite being unable to personally inspect the fire scene. In the present case, he studied the records from the first trial, interviewed the firefighters, and examined the pictures. He testified:

> This fire was a Class A fueled with paper and plastic fabrics, accidental natural growing, meaning unaccelerated by a petroleum compound type fire. Secondly, analysis of the burn patterns on Ms. Lance and Mr. Garrett proved that Ms. Lance and Mr. Garrett were exposed to that fire at the same point in time with the fire.... Furthermore, there are burn patterns indicating a direction quality to the fire, and a height in the room to the fire. My findings included that this fire was not fueled by kerosene, the point of origin was not on the

16

floor, rather it was in the love seat. And the ignition source was the carelessly dropped cigarette from an intoxicated, wasted as it were, person.

Mr. Bayne elaborated that based upon the medical reports, the victim and the defendant sustained burns on their faces and left arms as a result of being exposed to the flames in the living room at the same time. He opined that because the burns were on the upper portions of the victim and the defendant, the fire did not originate in the floor. He believed that the burns on the couple were consistent with them trying to reach the front door and with the defendant's statement to him that, after a night of drinking, the couple returned home and smoked cigarettes, with the victim falling asleep on the love seat and the defendant falling asleep on the couch.

Mr. Bayne opined that the fuel load in the front room, including the furniture and the wood paneling covering the sheetrock walls, explained the fire growth. He opined that the defendant did not receive his burns from igniting kerosene and that it was "impossible" for the victim to have received her burns from inside the utility room. He dismissed the burn pattern on the front room floor as resulting from radiant heat or "flash over."

Mr. Bayne testified that the utility room door edge had scuff marks which indicated that the door stuck in the door frame. He testified that the defendant confirmed to him that the door tended to stick. Mr. Bayne opined that the latch bar was "very carbonized ."

On cross-examination, Mr. Bayne testified that in reaching his conclusions, he ignored Otis Jenkins' claim that the utility room door had been latched. He declined to say how much time elapsed between the deposit of a lit cigarette in the love seat and the onset of a blaze, although he suggested that the process could take minutes or hours. He opined that the presence of the plastic container of kerosene in the kitchen was irrelevant to the cause of the fire. He conjectured that because the container had three holes in the top, the firefighters or investigators could have sloshed some of the kerosene onto the bedspread.

**The defendant did not testify in the case.***FN5*

> ***FN5*The defendant underwent a voir dire examination by the trial judge and counsel that validated his decision not to testify**.

Garrett, 2005 WL 3262933 at *1-9 (emphasis added).

The facts found by the Tennessee appellate court on Petitioner's state post-conviction claims

are set forth in the analysis of Petitioner's ineffective assistance of counsel and expert witness claims.

## B. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412.

In Greene v. Fisher, 132 S. Ct. 38 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of th[e] [Supreme] Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final"

and answered the question in the affirmative. Id. at 42. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. Id. at 43. The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. at 43-45. The Supreme Court noted a different result if the Petitioner had applied for the writ of certiorari or had filed a state postconviction petition. Id. at 45.

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Supreme Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law." Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "'state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.'" Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing

evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

This presumption includes the state courts' credibility findings. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

Petitioner presents the following claims tha,t based on the State record, the Court concludes to be exhausted claims:

1. Whether the evidence is sufficient to support the petitioner's conviction for first degree felony murder. (Docket Entry No. 12 at 4.)

2. Whether the State committed prosecutorial misconduct by knowingly introducing false testimony. (Docket Entry No. 12 at 4.)

3. Whether the petitioner received ineffective assistance from his trial and appellate counsel. (Docket Entry No. 12 at 3.)

4. Whether the trial court erred by allowing James Cooper to testify. (Docket Entry No. 12 at 4.)

5. Whether new scientific evidence establishes the petitioner's actual innocence of first degree felony murder. (Docket Entry No. 12 at 3.)

Some of these claims are interrelated and will be addressed on that basis.

### 1. Sufficiency of the Evidence

To prove a Fourteenth Amendment claim for insufficient evidence to support a conviction, Jackson v. Virginia, 443 U.S. 307 (1979), sets forth the following standards:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, **the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.** This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to

draw reasonable inferences from basic facts to ultimate facts. **Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.** The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. at 318-19 (emphasis added with footnotes and citations omitted). In a word, if any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. Id. at 324.

Circumstantial evidence, if sufficient to establish an element of the offense, satisfies the constitutional requirement of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (per curiam); United States v. Eisner, 533 F.2d 987, 989 (6th Cir. 1976), and such evidence need not remove every reasonable hypothesis except that of guilt. United States v. Vannerson, 786 F.2d 221, 225 (6th Cir. 1986); Tilley v. McMackin, 989 F.2d 222, 225 (6th Cir. 1993). Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution. Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985). This due process guarantee on the sufficiency of the evidence extends only to the elements of the crime, not to the state's burden to prove the absence of an affirmative defense, unless the state has made the absence of a defense an element of the crime. See Allen v. Redman, 858 F.2d 1194, 1196-98 (6th Cir. 1988). At that point, sufficiency of evidence on the issue will be relevant. Id. at 1197-98.

Hearsay evidence can be used to support a state conviction provided such proof qualifies as an exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 355-57, 356 n.8 (1992). The standard is whether the hearsay evidence carries sufficient guarantees of trustworthiness. Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993). It is unnecessary to establish the unavailability of the declarant, if the hearsay statements were made in a prior court proceeding. White, 502 U.S. at

21

352-56; United States v. Inadi, 475 U.S. 387, 394 (1986).

On Plaintiff's second direct appeal, the Tennessee Court of Appeals deemed the following evidence sufficient to support Petitioner's conviction:

> A crime may be established by direct evidence, circumstantial evidence, or a combination of the two. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn.1987). Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. at 484, 470 S.W.2d at 613.

> For purposes of the present case, felony murder is committed by one who kills another in the perpetration of, or attempt to perpetrate, any arson, Tenn.Code Ann. § 39-13-202(a)(2) (2003), and arson is committed by one who knowingly damages any structure by means of a fire or explosion "[w]ithout the consent of all parties who have a possessory, proprietary or security interest therein," id. § 39-14-301. The defendant posits that the state failed to establish that the house and its contents were damaged *without the consent* of all persons having a possessory or propriety interest therein.

> **We disagree. The evidence showed that the deceased victim resided with the defendant in the fire-damaged house. The evidence also revealed that the house contained household furnishings and other personalty. A photograph depicted smoke-damaged bedroom furniture where the victim and the defendant slept. All in all, the circumstantial evidence was sufficient to establish that the victim had at least a possessory interest in the house and furnishings.**

> **We hold that the evidence also circumstantially supports a finding that the damage was caused without the victim's consent. One component of the evidence that circumstantially established that the defendant set the fire is that the defendant placed the victim in the utility room and latched the door from the outside before setting the fire. This component also serves to establish an absence of the victim's consent. We are confident there is no reasonable basis for theorizing that the victim consented to setting fire to a house in which she was trapped and doomed to die by inhaling noxious gases.**

> **Accordingly, we conclude that the evidence sufficiently supports the jury's finding that the defendant committed felony murder based upon its finding that**

22

**the victim's death resulted from the defendant's perpetration of arson**.

Garrett, 2005 WL 3262933 at *10 (emphasis in original and added).

From this Court's review, given the state's circumstantial evidence of the nature of the fire

burns and that the victim was found in the utility room, with the door to that room latched from the

outside, the Court concludes the State's proof is sufficient to support Petitioner's conviction. Thus,

this Court concludes that the Tennessee courts reasonably determined that Petitioner was guilty of

first degree murder beyond a reasonable doubt. The Court concludes that this claim lacks merit.

### 2. Actual Innocence Claims

Petitioner's claim of actual innocence is clearly related to Petitioner's exhausted claim that

new scientific evidence establishes his actual innocence of felony murder, and the latter claim was

presented in Petitioner's post conviction appeal. Garrett, 2012 WL 3834898 at *14. The facts for

these claims were found by the Tennessee appellate court as follows:

> A post-conviction hearing was held over two days, August 30, and October 13, 2010.
> At the hearing, the post-conviction court heard the testimony of John Joseph Lentini,
> trial counsel, Bayne, the Petitioner, and Dr. Robert Roth.
>
> Lentini testified as an expert in the field of fire analysis and fire science. Lentini
> stated that he had personally investigated over 2,000 fires but that he primarily
> reviews the fire investigations of others. Lentini is certified by the National
> Association of Fire Investigators and the International Association of Arson
> Investigators ("IAAI"), and he discussed in detail his education, qualifications, and
> peer-reviewed publications.
>
> Lentini claimed to be familiar with the history and development of fire science and
> investigation. He defined "fire science" as "the application of the laws of chemistry
> and physics to the investigation of fires."Lentini said that he is a member of the
> National Fire and Protection Association ("NFPA") Technical Committee, which is
> responsible for the maintenance of NFPA 921, Guide for Fire and Explosion
> Investigations. Lentini stated that NFPA 921 presently represents the standard of care
> in fire investigations. In 1985, the NFPA Standards Council "became concerned
> about the quality of work that they saw in fire investigations" and produced NFPA
> 921 as a guide for fire investigators. NFPA 921 was first published in 1992 and

gained gradual acceptance over the following years. According to Lentini, in 2000, the United States Department of Justice embraced NFPA 921 as a benchmark and the IAAI called it the de facto standard of care. Lentini stated that it was the embrace of the scientific method that led to the acceptance of NFPA 921 as the standard of care in the field. On cross-examination, Lentini acknowledged that NFPA 921 had undergone revisions since its original publication in 1992. Lentini believed that such revisions represented a feature of NFPA 921 as it is "constantly reviewed by the fire investigation community, commented on, and maintained as a standard."

Lentini discussed certain "mythologies" of arson investigation, which he claimed many arson investigators previously embraced but have since been discredited by the scientific community. Lentini read from a National Academy Report on the State of Forensic Science issued in February, 2009.*FN4* Specifically, the concluding paragraph of the report's discussion on fire and arson investigation, stated as follows:

> FN4 The report itself was not entered into evidence.

> By contrast, much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants. Despite the paucity of research, some arson investigators continue to make determinations about whether or not a particular fire was set.

> However, according to testimony presented to the committee,*FN5* many of the rules of thumb that are typically assumed to indicate that an accelerant was used (e.g., alligatoring of wood, specific char patterns) have been shown not to be true. Experiments should be designed to put arson investigations on a more solid scientific footing.

> *FN5*Lentini indicated at the post-conviction hearing that he was the person who offered this testimony to the committee.

Lentini testified that he had reviewed portions of the record in this case, including Cooper's trial testimony,*FN6* Cooper's investigation report, and photographs of the fire scene. Lentini stated that from reviewing the photographs, "it was pretty clear that the fire originated in the living room, [and] it was pretty clear that it went to flashover."Lentini explained further that, When fires achieve flashover, they light the floor on fire. A lot of time—in fact, early in my career that was considered to be a suspicious thing because fires burn up and the floor shouldn't burn, but it is now pretty well accepted that when a room becomes fully involved one of the things that is going to burn is the floor and you, typically, get irregular burns on the floor.

> *FN6*Notably, on cross-examination, Lentini stated that he had only read Cooper's testimony from the first trial.

24

When asked whether he had identified any "mythology" in this case, Lentini responded:

> The only mythology is the belief on the part of the investigator that he can, by looking at the floor, determine the difference between charring done by radiation and charring caused by a flammable liquid.

> Then he goes one step further and believes that he can tell the difference between flammable liquid charring caused by a spill, an accidental spill, or flammable liquid charring caused by an intentional pour, and that is just beyond the scope in terms of what is valid or what is generally accepted as valid in fire investigation.

\* \* \*

At the post-conviction hearing, Lentini testified that NFPA 921 is the standard of care in fire investigations. Lentini testified that NFPA 921 was first published in 1992 as a guide for fire investigators. Lentini noted that, prior to the publication and acceptance of NFPA 921 as the standard in the field, arson investigators adhered to certain "mythologies" that had since been discredited by the scientific community. In describing one such mythology, **Lentini quoted from a National Academy Report on the State of Forensic Science which concluded that**:

> **[M]uch more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants. Despite the paucity of research, some arson investigators continue to make determinations about whether or not a particular fire was set**.

> **However, according to testimony presented to the committee, many of the rules of thumb that are typically assumed to indicate that an accelerant was used (e.g., alligatoring of wood, specific char patterns) have been shown not to be true. Experiments should be designed to put arson investigations on a more solid scientific footing**.

Lentini explained that from reviewing the photographs in this case, he could determine that the fire went to flashover. This fact indicated to him that the floor lit on fire, which could have produced the evident burn patterns. Lentini was highly skeptical that Cooper could tell the difference, simply by visually inspecting the floor, between burn patterns caused by flashover and burn patterns caused by the use of an accelerant. Further, Lentini believed that Cooper's conclusion that he could tell the difference between the intentional and accidental use of an accelerant from visual inspection of the burn patterns was "beyond the scope ... of what is valid or is generally accepted as valid in fire investigation."

Bayne raised these same concerns with trial counsel prior to trial. In emails, he told trial counsel that "much new evidence has come to light from testing since 1992 to show that one cannot distinguish pour patterns from other solid-fuel induced patterns by the patterns themselves ..." and that the evidence Cooper intended to offer "was not generally accepted in the scientific community, especially since 1992." Bayne informed trial counsel that he intended to use NFPA 921 to rebut Cooper's testimony. He also recommended that trial counsel ask Cooper technical questions related to flashover conditions and effects. In one email, Bayne advised trial counsel to ask Cooper about "his uncertainty about the floor burn patterns" as well as "his respect for NFPA 921." Bayne also warned trial counsel, however, that Cooper would be testifying "as one who has learned much in the 11 years since the fire."

At trial, Cooper testified that the fire began in the front room and was deliberately set. He maintained that he had approached his investigation in a scientific manner. Cooper based his conclusions on several observations, including the exclusion of electrical or accidental causes, the burn patterns on the living room floor, the saturation of kerosene in the kitchen, the latched utility room door, and the disabled smoke alarm. Trial counsel asked Cooper to explain flashover, and, after doing so, Cooper admitted that the living room in this case appeared to have been fully involved in fire. He also acknowledged that flashover can occur with or without the use of an accelerant and that radiant heat from flashover can leave burn patterns on the floor. When asked whether he could distinguish between burn patterns caused by radiant heat and those caused through the use of an accelerant, Cooper acknowledged that it can be difficult and that less experienced investigators sometimes mistake the two. However, Cooper maintained that he could tell the difference. Cooper also maintained that he did not base his decision solely on the presence of a pour pattern, but rather took that evidence and combined it with other indicia of arson, such as the kerosene soaked bedspread, the latched door, and the disabled smoke alarm. Cooper was not asked about NFPA 921 or advancements in the scientific community's understanding of fire science in the years between the first and second trials.

Id. at **7-9, 18-19 (emphasis added).

On this claim, the Tennessee appellate court first cited the state trial court's findings on Petitioner's proof of the applicable new science:

The post-conviction court found Lentini's testimony to be unavailing, stating that:

> Mr. Lentini only testified about his record and accomplishments but nothing relevant to the case under examination. He simply stated that the fire in question was not started by the use of an accelerant but provided no basis upon which this conclusion was founded. Mr.

Lentini basically just testified as to his opinion of the science and its evolution.

The post-conviction court also found that Cooper's trial testimony accounted for the possibility that radiant heat damage could sometimes be mistaken for a pour pattern:

> Agent Cooper testified as to various "V-patterns" discovered in the house which he explained would indicate the use of an accelerant in the spread of a fire. With regard to such a pattern discovered underneath some baseboard removed from the living room, he stated that radiant heat damage can sometimes be mistaken for a pour pattern by less experienced investigators but that he possessed extensive experience that provided him with the ability to differentiate between the two. Agent Cooper apparently believed that the evidence pointed to the existence of an accelerant on the baseboard due to the fact that an accelerant would normally run underneath baseboards in this fashion. He also admitted that polyester meltdown from furniture could appear as a pour pattern[,] but he adamantly averred that he could discern between the two based upon his experience as a fire investigator.

The post-conviction court ultimately concluded that the Petitioner had "failed to submit sufficient proof at the evidentiary hearing to show that the fire analysis and investigation in this case was erroneous based upon obsolete techniques that have since been debunked."

2012 WL 3834898 at *14.

In its independent findings and ruling on this claim, the Tennessee appellate court reasoned that the cited new scientific standards are evolving, but the State's proof remained sufficient to prove Petitioner's guilt.

> The Petitioner argues on appeal that the current scientific understanding does not support Cooper's testimony and that, through trial counsel's failure to point this out at trial, the jury was left with the impression that the two experts' opinions were equally weighted. After due consideration, we ultimately cannot agree with the Petitioner's position.
>
> **First, the evidence that the Petitioner submitted at the post-conviction hearing**

**regarding the current scientific understanding of floor burn patterns is not as decisive as he contends. In this regard, we note that the Petitioner did not admit any portion of NFPA 921, which he purports represents the standard of care in the field. Thus, while the Petitioner complains that Cooper failed to abide by the industry standard, we can only speculate as to exactly what that standard requires. Moreover, Cooper was not presented as a witness at the post-conviction hearing, so we also must speculate as to his familiarity and conformance with NFPA 921.** We also note that the post-conviction court found that Lentini's testimony was not relevant specifically to the case at hand. This conclusion diminishes substantially the weight that we afford Lentini's testimony.

Further, **the scientific developments that the Petitioner cites do not necessarily exclude the possibility that Cooper could have reached the conclusion of arson using the methods that he did. Lentini, quoting from the concluding paragraph of a scientific report, stated only that *"much more research is needed* on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants." (Emphasis added). The report continued that while "many of the rules of thumb" associated with the use of an accelerant "have been shown not to be true," *"[e]xperiments should be designed* to put arson investigations on a more solid scientific footing."** (Emphasis added).

**From this testimony, we conclude only that the scientific understanding of burn patterns is evolving and unsettled. More importantly, from the testimony at trial as well as the post-conviction hearing, it is apparent that burn patterns may be left on a floor during a fire *either* through the use of an accelerant *or* through radiant heat during flashover (or presumably, both). Critically, neither Bayne's nor Lentini's testimony at the post-conviction hearing negated the possibility that a burn pattern could be left from the ignition of an accelerant.**

At trial, Cooper repeatedly stated that a burn pattern can be caused by either the ignition of an accelerant or radiant heat. Cooper believed that the burn patterns in this case were indicative of accelerant use while Bayne believed they were caused by radiant heat. Thus, the two possible interpretations of the burn patterns were presented to the jury even if the fact that the scientific understanding of burn patterns had changed was not. It is true that Cooper maintained that his experience allowed him to tell the difference between a burn pattern caused by an accelerant versus one caused by radiant heat. Perhaps trial counsel could have countered Cooper more effectively on this point. **We do agree with the Petitioner that evidence of the changing standards in fire investigation methodology, to the extent that they differed from Cooper's methodology, could have helped the Petitioner's case. We, however, do not believe that trial counsel was deficient for failing to elicit**

**such testimony, nor do we believe that a reasonable probability exists that such testimony would have changed the outcome of the trial.**

Id. at *20-21 (emphasis in original and added).

In the federal habeas action, "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). "[A] credible claim of actual innocence is extremely rare," Souter v. Jones, 395 F.3d 577, 600 (6th Cir. 2005), and "the actual innocence exception should 'remain rare' and 'only be applied in the extraordinary case.'" Id. at 590 (quoting Schlup v. Delo, 513 U.S. 298, 321 (1995)) (internal quotation marks omitted). Examples of "new reliable evidence" are "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. "This 'gateway actual innocence claim' does not require the granting of the writ, but instead permits the petitioner to present his original habeas petition as if he had not filed it late." Perkins v. McQuiggin, 670 F.3d 665, 670 (6th Cir. 2012). In assessing such proof, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327–28) (internal quotation marks omitted); Bell v. Howes, 703 F.3d 848, 855 (6th 2012).

Upon review, the Tennessee appellate court's ruling reflects that Lentini quoted relevant portions of the new scientific evidence in his testimony. That report of new scientific evidence reflects only the need for more research. The Tennessee courts concluded that the new scientific evidence did not negate the State's expert proof that the burn patterns were the result of the ignition of an accelerant. Coupled with the fact that the victim was found in the utility room, with the door

to that room latched from the outside, the Court concludes that based upon the State record, the

Tennessee courts reasonably determined that this claim lacks merit.

### 3. Admission of Expert Testimony

Another related claim is Petitioner's claim that at his second trial, the trial court violated

Petitioner's due process rights by admitting the testimony of James Cooper, the State's expert,[3]

that was presented on Petitioner's first post-conviction appeal. The Tennessee Court of Criminal

Appeals summarized the pertinent facts about Cooper's qualifications as an expert:

> Prior to the second trial, the Petitioner challenged the qualifications of the State's expert witness, Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") Agent James Cooper. The trial court subsequently held a <u>Daubert</u> hearing to test Cooper's qualifications. While testifying as an expert at the first trial, Cooper had opined that the fire's area of origin was in the living room in the front of the house. In part, he based his conclusion of arson on the existence of a "pour pattern" on the living room floor, which Cooper maintained was indicative of the use of an accelerant by the arsonist. At the <u>Daubert</u> hearing, trial counsel declared that he wished to voir dire Cooper "both on his qualifications and his ability to render a scientific opinion that there was a pour pattern" in the house.
>
> Cooper noted at the hearing that he had been qualified to testify as an expert in the field of arson investigation at the first trial in 1993. **Cooper discussed his educational and professional qualifications, which included current certification as a fire investigator by the International Association of Arson Investigators. Cooper went into management for the ATF in 1994, at which point he participated in fire investigations in a supervisory role only. At the time of the <u>Daubert</u> hearing, Cooper had retired from the ATF and no longer performed fire investigations. Cooper said that he had received instruction in fire science, which he defined as "the study of fire behavior," but he did not consider himself an expert in the field**. Cooper stated that when trying to determine the cause of a fire he would analyze the fire scene and conduct interviews with witnesses.

---

[3]This claim was presented to the state courts as a violation of state law. And yet, given the exhausted sufficiency of the evidence claim, this Court will consider this claim as subsumed within that claim.

Trial counsel then began to ask questions related to Cooper's investigation of the fire in the present case. The State objected that trial counsel was attempting to conduct discovery rather than challenge Cooper's expertise. Trial counsel responded that he was attempting to show that Cooper was unable to render an opinion regarding a pour pattern in the house. The trial court allowed him to question Cooper further. **Trial counsel then questioned Cooper extensively regarding his methodology investigating this particular fire. Cooper responded that, in determining the cause of the fire, he looked at several factors and did not exclusively focus on the pour pattern. The most important factor to Cooper was whether the utility room door where the victim had been found was indeed locked. He also cited the presence of a bedspread soaked in kerosene as a key factor in his determination. He stated that the pour pattern on the floor was "not the only thing that was significant in my determination" and that he could "[p]robably not" make a determination of arson based solely on the pour pattern.**

Trial counsel asked Cooper whether he was familiar with the United States Fire Administration Fire Burn Pattern Tests, and Cooper replied that he was not. Trial counsel continued:

> Q: ... Now, floor patterns produced by the ignition of an ignitable liquid were not always visible after a fire which produced flash over conditions. Would you agree with that?
>
> A: It all depends on what type of liquid it was....
>
> Q: It was observed that flash over also produced patterns on the floor as a result of the pyrolysis or ignition of the floor surface?
>
> A: Again, all depends on those variables and the condition of that room.

Shortly after this exchange, the trial court ended the hearing after determining that Cooper's testimony was "based on sound information and belief." Cooper was thus allowed to testify as an expert at trial.*FN1*

> *FN1* Although the State questioned Cooper extensively regarding his qualifications as an expert witness, it does not appear from the trial transcript that the State actually proffered him before the jury as an expert. However, we note that on appeal the Petitioner raised as an issue the admission of Cooper's expert testimony, and this Court determined that the trial court did not err in allowing Cooper to testify

as an expert. See Claude Francis Garrett, 2005 WL 3262933, at *
15–17. Thus, we do not discern any contention regarding the fact that
Cooper testified as an expert witness at trial.

### Evidence at Trial

In our prior opinion, we summarized Cooper's trial testimony:

> **James Cooper testified that he had retired as an agent of the
> United States Department of Treasury Bureau of Alcohol,
> Tobacco and Firearms (ATF). As an ATF agent, he had been a
> certified fire investigator and a fire-cause and origin specialist.
> Because local authorities had requested that he assist in
> investigating the fire that killed the victim, he inspected the house
> on the evening of February 24, after the fire department had
> washed the flooring with a booster hose. He opined that the
> washing did not obstruct or hamper his observation of the burn
> pattern.** He concluded that the fire began in the front room. He found
> no evidence of an electrical or other accidental cause of the fire. A
> kerosene heater found in the bedroom was not the cause of the fire.
> He discovered a saturation of kerosene in the kitchen. The utility
> room door was closed during the fire. Mr. Cooper testified that
> [Metro Fire Department Captain] Otis Jenkins told him that he had
> "had to use two hands to slide the bolt on the latch to the other side
> to open the door."

> Mr. Cooper testified that he collected material from beneath the
> baseboard in the front room because liquid spilled in the floor would
> typically run under a baseboard and because the flooring beneath the
> baseboard was free of foot traffic occurring during and after the
> firefight. Also, he found a "V" pattern on the baseboard, which to him
> was "like a red flag waving at you," indicating an accelerated fire. Mr.
> Cooper presented a number of pictures and slides of the fire scene. He
> opined, "[T]his was a deliberately set fire, arson. Somebody went into
> the house, and their design, their intent, was to spread the fire from
> the front room to the back where the victim was."

> Defense counsel engaged Mr. Cooper in a rigorous
> cross-examination, during which the witness testified that the kitchen
> floor contained "[q]uite a bit of water," that a portion of the liquid on
> the bedspread was water, and that he relied upon Detective Miller's
> report of his interviews of the firefighters and did not interview them
> personally other than to talk with Otis Jenkins. Mr. Cooper did not
> see the house before the booster-hose cleansing and did not see the

front-room furniture in its pre-fire position. He insisted, however, that the flooring in the front room evinced a "pour pattern," indicating that a liquid accelerant had been poured in the floor. He admitted that polyester from furniture could melt onto the floor and simulate a pour pattern but maintained that he could distinguish a pour pattern from a polyester meltdown. He admitted that one photograph showed that the latch bar was dark, as if it was coated in carbon, which might indicate that the bar was not inserted into the latch housing during the fire.

Claude Francis Garrett, 2005 WL 3262933, at *6–7.

For purposes of this opinion, we supplement our prior summary of Cooper's testimony with the following relevant facts. During cross examination, trial counsel asked Cooper to describe "flashover." Cooper explained that flashover occurs when "everything in [a] room reaches its combustible ignition." As a fire in a room grows, superheated gases rise until they become trapped by the ceiling and begin to bank down towards the floor. Eventually, the "whole room will be in fire, from the ceiling down to the floor. That is a flashover." Cooper acknowledged that the living room in this case appeared to have been fully involved in fire. Cooper also acknowledged that flashover can occur with or without the use of an accelerant and that the radiant heat caused by flashover can create burn patterns on the floor because the heat ignites the floor.

Trial counsel asked Cooper whether he could distinguish burn patterns on a floor caused by radiant heat from those created after pouring and igniting an accelerant on the floor. Cooper answered:

> [R]adiant heat normally, normally, will burn, coming from the ceiling down, uniformly, even. A pour pattern will be irregular and into the floor[,] into the wooden material. But the radiant heat can, also, indicate a pour pattern if the air movement changes. As an investigator you have to realize that. And that's why you have to be careful not to jump the gun. I am satisfied in front of that door, inside the front door, is radiant heat. I am satisfied in the center of the living room, near that window, there is a pour pattern.

**Trial counsel asked Cooper on what scientific basis he formed his opinion that a pour pattern existed on the living room floor. Cooper replied that he used his experience and training in determining the presence of a pour pattern. Cooper elaborated:**

33

I have set fires ... pouring things. I have spilt [sic] things, to see the difference in an accidental spill and a deliberate pour. I have talked to other investigators, where they call radiant heat arson. They call it a pour pattern. Through my training, I can make that distinction from pour pattern versus radiant heat. Now radiant heat can be irregular. It all depends on what is going on inside the interior of that building at the time.

When asked about the possibility of error in his analysis, Cooper responded:

I don't know. I mean, all I can testify to is, I've done pours. I've done accidental spills. I have been on another fire fatality where another investigator called radiant heat a pour pattern, and I actually said, it is radiant heat. Just through my training and experience.

... [I]f I'm proven wrong I will admit I am wrong. But on this one, no sir. I was there. I saw it with my eyes. And, I know the difference in radiant heat and a pour pattern, sir.

**Trial counsel then asked Cooper whether he performed his fire investigations using the scientific method, which trial counsel defined as "defining a problem, collecting relevant data, and then analyzing that data and applying it to the problem." Cooper replied that he did so in this case. Cooper explained that when forming his hypothesis certain things stood out:**

[A]ll these abnormal things come together[.][N]ot one thing stands by itself. The pour pattern in the living room does not stand by itself. You have to have the bedspread. You have to have the kerosene can. You have got to have that latch on the door. You have got to have the smoke alarm.*FN2* And you have got to have where [the victim] was found, and what was on top of [the victim]. That is the hypothesis. The hypothesis is the cause of the fire, which was arson....

*FN2* The evidence at trial showed that firefighters found a smoke detector without batteries or a cover lying on either the washer or dryer in the utility room. Claude Francis Garrett, 2005 WL 3262933, at *5.

In addition to the burn patterns on the floor, the burn patterns on the bodies of the victim and the Petitioner were a contested issue at trial. The State's evidence showed that the victim most likely received her burns in the utility room. As set out in our previous opinion,

> The forensic pathologist[, Dr. Gretel Harlan,] who performed an autopsy on the victim testified that the victim died from inhaling smoke and noxious gases, probably succumbing within 10 to 30 minutes after she began to breathe smoke. The victim's blood alcohol level was .06 percent. The physician testified that the victim had burns on her head and left arm and that the burns probably resulted from heat build-up in the utility room where the victim was found. Other than the burns, the victim's body had suffered no other trauma. The physician opined that fire victims will frequently retreat to a room away from the fire and have been known to burrow under objects to protect themselves.

Garrett, 2012 WL 3834898 at *2-5 (quoting Garrett, 2005 WL 3262933, at *6-7, 3) (emphasis added).

After its analysis of the Tennessee's Rule of Evidence of expert testimony, that is parallel to Federal Rule of Evidence 702, the Tennessee appellate court concluded Cooper's testimony as an expert was admissible.

> The record does not reveal that the trial court abused its discretion in accepting Mr. Cooper as an expert and allowing him to offer his conclusions regarding the presence of a pour pattern in the front room of the defendant's house. The defendant argues that Mr. Cooper's testimony failed to establish a reliable scientific basis for his opinion that a pour pattern existed on the floor of the front room in the defendant's house. However, **when viewing Mr. Cooper's testimony as a whole, we find that the court had a sufficient basis for allowing Mr. Cooper's testimony and accordingly did not abuse its discretion by admitting it. Mr. Cooper testified that he had been extensively trained in fire investigation, had investigated between 150 and 200 fires, and had instructed others in fire investigation. Mr. Cooper based his conclusion on his observation that the front room had suffered fire damage, whereas the other rooms in the house had only suffered smoke and heat damage. Moreover, Mr. Cooper determined the existence of a pour pattern in the front room based upon his experience of examining numerous fire scenes.**

**He opined that radiant heat damage is often mistaken for a pour pattern by less experienced fire investigators but that his extensive experience allowed him to make that distinction and definitively identify the existence of a pour pattern in the defendant's front room. At trial, Mr. Cooper elaborated that he examined the baseboards in the defendant's front room because an accelerant will usually run under a baseboard. Under one baseboard he discovered a "V pattern," which is caused by an accelerated fire. Mr. Cooper testified that these individual conclusions formed the basis for his opinion that the defendant's house fire had been deliberately set.**

As noted earlier in this opinion, defense counsel subjected Mr. Cooper to a rigorous cross-examination, in which he elicited, inter alia, that Mr. Cooper did not interview many of the witnesses personally despite his assertion that witness observations played a crucial role in his analysis of a fire scene, that Mr. Cooper did not observe the defendant's house before the booster-hose cleaning, and that he did not see the front furniture in its pre-fire position. **During cross-examination, Mr. Cooper conceded that a pour pattern could be mimicked by a polyester meltdown, although Mr. Cooper insisted that he could distinguish between the two. Moreover, the defendant presented the testimony of his own expert, Stewart Bayne, who testified that the fire was accidental, unaided by accelerants.**

**Thus, we conclude that there was a sufficient indicia of reliability to support the trial court's decision to allow Mr. Cooper's expert testimony and that defense counsel's artful cross-examination of Mr. Cooper coupled with the defendant's presentation of a competing version of the fire's cause through the testimony of his own expert witness gave the jury ample opportunity to reject Mr. Cooper's testimony.**

Garrett, 2005 WL 3262933 at *16-17 (emphasis added).

An issue concerning admissibility of evidence does not arise to a level of constitutional magnitude unless the admission of such evidence can be viewed as so egregious that Petitioner was denied a fundamentally fair trial. See Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988); Davis v. Jabe, 824 F.2d 483, 487 (6th Cir. 1987); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Smith v. Sowders, 848 F.2d 735, 735-39 (6th Cir. 1988). The federal courts are bound by decisions of an intermediate state appellate court unless convinced that the highest state court would decide the issue

differently. <u>Olsen v. McFaul</u>, 843 F.2d 918, 929 (6th Cir. 1988). To warrant habeas relief, the excluded evidence must be critical, that is, the evidence must "'tend to exculpate'" Petitioner and also must contain "'persuasive assurances of trustworthiness.'" <u>Turpin v. Kassulke</u>, 26 F.3d 1392, 1396 (6th Cir. 1994) (citations omitted). A question of purely state law rarely serves as a basis for habeas corpus relief. The Supreme Court has since reemphasized that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle</u>, 502 U.S. at 67-68.

Here, Tennessee law on admission of expert testimony tracks the federal rule. <u>See</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993). <u>Daubert</u> imposes a "judicial gatekeeping" role upon the district courts for expert opinion testimony based on scientific knowledge. <u>Daubert</u> requires that in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method, i.e., "a grounding in the methods and procedures of science . . . [that] connotes more than subjective belief or unsupported speculation" and that "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." 509 U.S. at 590 (quoting <u>Webster's Third New Int'l Dictionary</u> 1252 (1986)). <u>Daubert</u>'s principles are applicable to experts with specialized knowledge. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 149 (1999).

After reviewing the State courts' findings on Cooper's certification, training, experiences, and analysis and the State courts' application of comparable Tennessee law on expert testimony, this Court concludes that the State courts reasonably applied comparable federal standards for the admission of Cooper's testimony. Cooper possessed extensive experience and specialized knowledge about fire analysis. Based upon the above cited proof, the State courts could reasonably

determine that the State's expert testimony had sufficient reliability to be admissible. Thus, this Court concludes that this claim lacks merit.

### 4. False Testimony

Petitioner's false testimony claim was raised in Petitioner's second direct appeal and focuses on the testimony of the three State witnesses. Petitioner cites alleged variances in these witnesses' testimony at Petitioner's first trial and their subsequent testimony at Petitioner's second trial, and Petitioner contends these variances rendered their testimony false. Garrett, 2005 WL 3262933, at *10. The Tennessee appellate court made the following findings of fact on this claim:

> The defendant argues that the state sponsored false testimony from three witnesses, Bobby Alcorn, James Cooper, and David Miller. Specifically, the defendant alleges that each of these witnesses testified at the instant trial differently than they testified at his first trial and that the differences in the witnesses' testimonies were detrimental to him.
>
> \* \* \*
>
> A. Bobby Alcorn
>
> The defendant asserts that by comparing the following colloquies from the defendant's first and second trials, this court should conclude that Bobby Alcorn testified falsely at the defendants second trial.
>
> The following is an excerpt from Bobby Alcorn's direct examination testimony at the defendant's first trial:
>
> Q: Okay. What was the first thing you saw when you went out of your house?
>
> A: Fire was hovering around the door facing and the window facing, I mean, just like this right here, shwisssssssh.
>
> Q: And what was Mr. Garrett doing?
>
> A: Well, when I got there-I took off running across the road and my Dad was to the sidewalk, and he picked up something and busted out that window. And by the time my Dad got to that one he'd take off to the next one. My Dad busted out that window. I mean, he busted-[the defendant] busted out that window and then my Dad went over there and was trying to listen to see if he could hear anything, hear her hollering.
>
> Q: Let me back up just a minute. What's the very first thing you saw Claude Garrett

do when you came up on the scene?

A: Well, he was at the window. I seen him pick up something and he busted out the window.

Q: Was it a lawn chair?

A: Some type of chair.

Q: He was picking it up?

A: Yeah.

....

Q: Okay. You seemed to be implying before that he broke the window out without listening to see if anybody was going to respond, or anything. Was that what you were saying or not?

A: No. 'Cause see, when my dad-when he-when I come out of the house and I seen that fire and I went back up into my room and got dressed, run across the street and by then he got-as I was getting across the street he was picking up a chair or something, I'm pretty sure it was a chair.

....

Q: Okay. Let me back up just one more time. You first looked out the window before you got dressed and you saw the house on fire? ... Did you see Mr. Garrett at that time? Or just the house?

A: I can't remember.

Q: Okay.

A: All I remember is that house on fire.

Q: Okay. You told me that he was, when you got over there you said he was screaming and hollering and running around the house, breaking out windows, is that what you told me?

A: No, I said he was busting out windows....

The defendant also presents this portion of Bobby Alcorn's cross-examination testimony from the first trial for the court's consideration:

Q: All right, well, did you see him standing out in the yard watching it burn?

A: No.

Q: The whole time you saw him he was running around trying to get in and put it out?

A: No, he wasn't trying to get in. He wasn't making no progress to get in.

Q: He was just breaking out the windows?

A: He was busted [sic] out the windows.

The defendant argues that the following excerpt of Bobby Alcorn's second trial testimony contains false testimony:

Q: When you looked outside, when you first looked outside, what did you see?

A: Just a fire really blazing out the front of the house. And I seen [the defendant], he was kind of squatted down by a tree.

....

Q: Now when you got outside the house, describe exactly again what you saw as far as what was going on across the street[.]

A: The front door and the two front windows was just blazing, it was rolling up, the fire was just rolling up the front. And right there by where it says chest or whatever, kind of diagonal of the house is where the tree was where I seen squatted down on side D.

Q: So you're indicating on the left corner of side A.

A: Yeah.

Q: And so that's the side where you saw what?

A: Where I seen [the defendant] squatted down.

Q: And can you demonstrate for the jury, if you can step out of your witness box for a moment, and demonstrate how you saw him by the tree?

A: (Whereupon witness complies.)

Q: Okay. Okay. Thank you. Did you eventually go to where [the defendant] was standing or squatting?

A: He was standing by the time I got over there.

Q: And did you seen him do anything else at that point?

A: I seen my dad, when my dad got over there, when my dad got about to the sidewalk and he got up and grabbed the chair, a lounge chair I think it was, and busted out a window.

The defendant asserts that Bobby Alcorn's first and second trial testimonies conflict because Bobby Alcorn testified at the first trial that the defendant was breaking windows and yelling for the victim when he first saw him but testified at the second trial that the defendant was "squatted down" by a tree while his house was burning when he first saw the defendant. The defendant further asserts that the state knew or should have known that it was soliciting false testimony from Bobby Alcorn. The state counters that Bobby Alcorn's testimonies are not contradictory and that the alleged inconsistency is the result of the witness's response to two different questions. Specifically, the state asserts that at the defendant's first trial, when asked, "What was the first thing you saw Claude Garrett do when you came upon the scene?", Mr. Alcorn responded that the defendant was "at the window," breaking it. At the second trial, Mr. Alcorn clarified that while he was still at his house before he

crossed the street to the defendant's house, he looked across the street and saw the defendant squatting by a tree. We agree with the state that the difference in the two testimonies is primarily attributable to the defendant's responses to different questions. We recognize, however, that in the first trial, Bobby Alcorn testified that when he first viewed the defendant's house from inside his house, he reported seeing the house on fire but did not refer to seeing the defendant squatting by a tree. We conclude that this discrepancy may represent more of a shift in emphasis than an actual contradiction, and at any rate, there is no indication that the second trial testimony was false or that the state presented testimony that it knew to be false.

## B. James Cooper

Next, the defendant complains that James Cooper, who was a special agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF) and who investigated the instant crime, testified falsely at his second trial that he interviewed a firefighter about whether the door to the utility room where the victim was found was latched when the firefighters entered the house. The defendant presents the following testimony in support of his argument:

[From the first trial:]

Q: Did you talk with the fire department to determine how much of the house they tore up, and how much was like that already, and how much the fire might have done[?] Can you just tell from looking at it what the fire department tore out?

A: I did not talk to any firefighters that actually suppressed the fire. Again, they weren't there at the scene and I was just there to determine the cause and origin of the fire. If they're normally there, yes, we would interview them, again, how they attacked the fire and so forth.

Q: So you didn't ask anybody specifically, did you kick this or.

A: No, sir.

Q: ... did that spread get pushed up there by the fire department or was that where it was all the time?

A: I did not interview the firefighters in reference to that.

[From the second trial:]

Q: During the course of your coming to a conclusion, or opinion, in this situation, did you attempt to interview any of the firemen that [sic] were there?

A: I did interview the firemen. I was particularly concerned about the latch system on the door where Ms. Lance was found behind.

Q: Do you remember who you spoke to?

A: I talked to the captain. Basically-I made observations that if the door was locked that door wouldn't be standing there. In other words, they would have taken that door down with a fire ax. They already know [sic] that we have Ms. Lance back there somewhere in the house. They are going in there to do a rescue. So, they know there is a human being back there, so they've got to get there. Time is crucial. But, if it was locked the door would have been taken off.

I talked to Captain Jenkins....

[Later in Mr. Cooper's testimony, the following colloquy transpired:]

Q: So what is your understanding of the position of that when Ms. Lance was found? Was it latched or unlatched?

A: Again, talking to Captain Jenkins, it was latched. He had to use two hands to unlatch-

The defendant posits that these testimonies reveal that Mr. Cooper testified falsely when he reported that he interviewed Captain Jenkins and that the state sponsored what it knew or should have known was false testimony. The state counters that the two testimonies do not conflict because in the first trial, Mr. Cooper testified that he did not interview any firefighters who suppressed the fire and may have damaged the house, whereas in the second trial, Mr. Cooper testified that he interviewed Captain Jenkins regarding whether the utility room door was latched. Captain Jenkins's role at the fire was to locate the victim, rather than extinguish the fire. Accordingly, the state argues that the two testimonies are consistent. We conclude that when viewed as a whole, the trial transcripts do not conclusively demonstrate that Mr. Cooper testified falsely at the second trial. Accordingly, we conclude that the defendant has not demonstrated that the state knowingly introduced false testimony by introducing Mr. Cooper's testimony.

C. David Miller

Finally, the defendant argues that Detective David Miller testified falsely at the second trial, as revealed by the inconsistencies between his first and second trial testimonies. Specifically, the defendant notes that Detective Miller testified at the first trial that the kerosene-soaked bedspread was "laying longways ... in front of the utility room door," whereas at the second trial, Detective Miller testified that the bedspread draped from the edge of the refrigerator to the door between the kitchen and the living room, forming the basis for his conclusion that the arsonist's intent

was to spread the fire from the fire's origin in the front room to the kitchen. The defendant further asserts that in the first trial, Detective Miller testified that he collected evidence under Mr. Cooper's direction and that this statement was supported by Detective Mike Roland's testimony that Detective Miller was "doing the actual collection of evidence" at the crime scene. The defendant asserts that this testimony from the first trial contradicts Mr. Cooper's testimony at the second trial that he was collecting evidence, not Detective Miller. The defendant presents the following testimony of Mr. Cooper in support of his argument:

[From the second trial:]

Q: ... you took a sample of kerosene from that jug and you put it into a little vial?

A: A vial. Yes, sir.

Q: How did you do that?

A: Very carefully, without spilling on the bedspread.

Q: That vial is about that big, isn't it?

A: Yes, sir. Again, I was able to put some in the vial.

Q: How?

A: I didn't pick the jug up and pour it in. No, sir. Again, I don't know-I am trying to remember. Did I open the mouth and stick it-I don't remember.

Q: It is melted shut. You couldn't get the lid open.

A: I am testifying, sir, I don't remember. But I was very careful. I do remember I took a sample out of that five gallon plastic container [ ] containing kerosene and put it in a vial. I do remember that, sir. And I was very conscious of not spilling it on the bedspread.

Q: And how did you collect the bedspread sample? Did you use a pair of scissors? Did you use a knife? How did you get that?

A: I had a knife....

....

Q: ... You have already been shown that sample of debris that you took out of the living room, that you said you took from the baseboard?

A: Yes, sir.

Q: And you took a piece of the baseboard?

A: Some of the baseboard. Yes, sir.

43

Q: And you took other debris-where did the rest of the debris come from? That whole can is full of debris. Where did that other stuff come from?

A: Sir, I took that-that was up against the baseboard. I did not want to disturb the baseboard where the V-pattern, was, the small V-pattern, then you have that wide V-pattern on the baseboard.

Q: Uh-huh.

A: I went ahead and collected what was against the baseboard, put it in the can, then, I took some of the baseboard myself and put it in the can.

The defendant asserts that this testimony demonstrates an inconsistency between the first and second trial testimonies, specifically a discrepancy about who collected evidence at the crime scene, Detective Miller or Mr. Cooper.

In regard to the defendant's assertion that Detective Miller testified falsely at the second trial about the placement of the kerosene-soaked bedspread, the state responds that Detective Miller testified at both trials that the bedspread was located in front of the refrigerator and that he never contradicted himself on this point. Regarding the defendant's assertion that Detective Miller perjured himself by testifying at the second trial that Mr. Cooper collected the evidence at the crime scene whereas he testified at the first trial that he collected the evidence himself, the state argues that the two testimonies are consistent because Detective Miller clarified at the second trial that Mr. Cooper actually collected the evidence and that he assisted Mr. Cooper in his collection procedures. Furthermore, the state argues that any discrepancy in the testimonies can be attributed to the effect that the eleven-year passage of time may have had on Detective Miller's memory of the evidence collection.

**We conclude that the defendant has not demonstrated that the state knowingly presented false testimony by offering Mr. Cooper's testimony at the second trial that he collected evidence at the crime scene. The testimony presented by the defendant in support of his argument does not definitively demonstrate the falsity of Mr. Cooper's testimony, and we hold that any discrepancy between the two testimonies is not indicative of perjury but rather may be attributed to an inaccurate recollection eroded by the significant passage of time between the crime and the instant trial.** See, e.g., State v. Charles E. Robinson, No. M2004-01163-CCA-R3-CD, slip op. at 6 (Tenn.Crim.App., Nashville, Aug. 17, 2005) (holding that the defendant failed to demonstrate that the state knowingly presented false, as opposed to inaccurate, testimony and noting that "[t]he

presentation of inaccurate testimony by a state's witness does not equate to a showing
that the state knowingly sponsored false testimony").

Garrett, 2005 WL 3262933, at **10-15 (emphasis added).

As a threshold consideration, the statutory presumption of correctness extends to the state court's determinations of credibility. "Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." Rice v. Collins, 546 U.S. 333, 341-42 (2006). A state court's credibility finding on a particular issue may be overturned by a habeas court only when "evidence on the issue[] raised . . . is too powerful to conclude anything but" that the trial court's finding was unreasonable. Miller-El v. Dretke, 545 U.S. 231, 265 (2005). For his false testimony claim, Petitioner must prove the cited testimony was deliberately false. Napue v. Illinois, 360 U.S. 264 (1959).

The State courts determined that the passage of time between Petitioner's two trials caused the cited variances in these witnesses' testimony and those variances were immaterial. In addition to the presumption of correctness, this Court deems the State courts' determination on this issue to be reasonable. Moreover, the cited testimony does not rise to the level of deliberate use of false testimony required under Napue. The Court concludes that this claim lacks merit.

### 5. Ineffective Assistance of Counsel Claims

In his post conviction appeal, Petitioner presented the following ineffective assistance of counsel claims that the Tennessee appellate court found meritless:

Specifically, the Petitioner makes the following arguments on appeal: (1) that trial counsel failed to present evidence that in the ten years between the first and second

trials, the methods by which the State's expert witness reached his conclusion of arson had been discredited by the scientific community; (2) that trial counsel failed to advance the defense theory of an accidental fire by not calling as a witness the physician who treated both the Petitioner and the victim to testify regarding the burn patterns on their bodies; and (3) that trial counsel failed to move for a mistrial when the State and the State's witnesses referenced the Petitioner's prior trial. After a thorough review of the record, we affirm the judgment of the post-conviction court denying relief.

Garrett, 2012 WL 3834898, at *1.

### a. Trial Counsel's Ineffective Examination of the Experts

This claim actually has two components. First, "[t]he Petitioner [] argues that he received ineffective assistance of counsel when trial counsel failed to present evidence that in the ten years between the first and second trials, the methods by which the State's expert witness reached his conclusion of arson had been discredited by the scientific community." Garrett, 2012 No. 3834898, at *17. The second component is that Petitioner's trial counsel did not properly examine the defense expert on the same subject. The latter component of this claim was addressed on Petitioner's post-conviction appeal. Id. at *22-23.

### 1. Petitioner's Counsel's Cross Examination of the State's Expert

Despite issues of exhaustion,[4] the Tennessee appellate court addressed the effectiveness of Petitioner's trial counsel's cross examination of James Cooper, the State's expert:

---

[4]"In this case, the trial record and the evidence adduced at the post-conviction hearing adequately provide the substance of the Petitioner's claim. Additionally, the post-conviction court's findings on the related issues stated above, as well as its general denial of the petition, provide a basis from which we can discern the post-conviction court's conclusions. Thus, we conclude that an adequate foundation for appellate review exists and, therefore, will review the substance of the Petitioner's claim." Garrett, 2012 WL 3834898, at *17.

Prior to the second trial, the Petitioner challenged the qualifications of the State's expert witness, Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") Agent James Cooper. The trial court subsequently held a <u>Daubert</u> hearing to test Cooper's qualifications. While testifying as an expert at the first trial, Cooper had opined that the fire's area of origin was in the living room in the front of the house. In part, he based his conclusion of arson on the existence of a "pour pattern" on the living room floor, which Cooper maintained was indicative of the use of an accelerant by the arsonist. At the <u>Daubert</u> hearing, trial counsel declared that he wished to voir dire Cooper "both on his qualifications and his ability to render a scientific opinion that there was a pour pattern" in the house.

Cooper noted at the hearing that he had been qualified to testify as an expert in the field of arson investigation at the first trial in 1993. Cooper discussed his educational and professional qualifications, which included current certification as a fire investigator by the International Association of Arson Investigators. Cooper went into management for the ATF in 1994, at which point he participated in fire investigations in a supervisory role only. At the time of the <u>Daubert</u> hearing, Cooper had retired from the ATF and no longer performed fire investigations. Cooper said that he had received instruction in fire science, which he defined as "the study of fire behavior," but he did not consider himself an expert in the field. Cooper stated that when trying to determine the cause of a fire he would analyze the fire scene and conduct interviews with witnesses.

Trial counsel then began to ask questions related to Cooper's investigation of the fire in the present case. The State objected that trial counsel was attempting to conduct discovery rather than challenge Cooper's expertise. Trial counsel responded that he was attempting to show that Cooper was unable to render an opinion regarding a pour pattern in the house. The trial court allowed him to question Cooper further. Trial counsel then questioned Cooper extensively regarding his methodology investigating this particular fire. Cooper responded that, in determining the cause of the fire, he looked at several factors and did not exclusively focus on the pour pattern. The most important factor to Cooper was whether the utility room door where the victim had been found was indeed locked. He also cited the presence of a bedspread soaked in kerosene as a key factor in his determination. He stated that the pour pattern on the floor was "not the only thing that was significant in my determination" and that he could "[p]robably not" make a determination of arson based solely on the pour pattern.

Trial counsel asked Cooper whether he was familiar with the United States Fire Administration Fire Burn Pattern Tests, and Cooper replied that he was not. Trial counsel continued:

Q: ... Now, floor patterns produced by the ignition of an ignitable liquid were not always visible after a fire which produced flash over conditions. Would you agree with that?

A: It all depends on what type of liquid it was....

Q: It was observed that flash over also produced patterns on the floor as a result of the pyrolysis or ignition of the floor surface?

A: Again, all depends on those variables and the condition of that room.

Shortly after this exchange, the trial court ended the hearing after determining that Cooper's testimony was "based on sound information and belief." Cooper was thus allowed to testify as an expert at trial.

Evidence at Trial

In our prior opinion, we summarized Cooper's trial testimony:

James Cooper testified that he had retired as an agent of the United States Department of Treasury Bureau of Alcohol, Tobacco and Firearms (ATF). As an ATF agent, he had been a certified fire investigator and a fire-cause and origin specialist. Because local authorities had requested that he assist in investigating the fire that killed the victim, he inspected the house on the evening of February 24, after the fire department had washed the flooring with a booster hose. He opined that the washing did not obstruct or hamper his observation of the burn pattern. He concluded that the fire began in the front room. He found no evidence of an electrical or other accidental cause of the fire. A kerosene heater found in the bedroom was not the cause of the fire. He discovered a saturation of kerosene in the kitchen. The utility room door was closed during the fire. Mr. Cooper testified that [Metro Fire Department Captain] Otis Jenkins told him that he had "had to use two hands to slide the bolt on the latch to the other side to open the door."

Mr. Cooper testified that he collected material from beneath the baseboard in the front room because liquid spilled in the floor would typically run under a baseboard and because the flooring beneath the baseboard was free of foot traffic occurring during and after the firefight. Also, he found a "V" pattern on the baseboard, which to him

48

was "like a red flag waving at you," indicating an accelerated fire. Mr. Cooper presented a number of pictures and slides of the fire scene. He opined, "[T]his was a deliberately set fire, arson. Somebody went into the house, and their design, their intent, was to spread the fire from the front room to the back where the victim was."

Defense counsel engaged Mr. Cooper in a rigorous cross-examination, during which the witness testified that the kitchen floor contained "[q]uite a bit of water," that a portion of the liquid on the bedspread was water, and that he relied upon Detective Miller's report of his interviews of the firefighters and did not interview them personally other than to talk with Otis Jenkins. Mr. Cooper did not see the house before the booster-hose cleansing and did not see the front-room furniture in its pre-fire position. He insisted, however, that the flooring in the front room evinced a "pour pattern," indicating that a liquid accelerant had been poured in the floor. He admitted that polyester from furniture could melt onto the floor and simulate a pour pattern but maintained that he could distinguish a pour pattern from a polyester meltdown. He admitted that one photograph showed that the latch bar was dark, as if it was coated in carbon, which might indicate that the bar was not inserted into the latch housing during the fire.

Claude Francis Garrett, 2005 WL 3262933, at *6–7.

\*     \*     \*

The defense's theory at trial was that the fire was accidental. As part of this strategy, the defense sought to prove that the burn patterns on the living room floor were caused by radiant heat during flashover. The defense also sought to prove that the burn patterns on the bodies of the victim and the Petitioner were similar. The defense proposed that the similarity of their burns proved that they had been exposed to the fire at the same time, thus negating the possibility that the Petitioner locked the victim in the utility room and started the fire.

\*     \*     \*

The Daubert motion in this case was the first one that trial counsel had ever filed, and, in order to prepare it, he consulted with other attorneys. Trial counsel stated that the purpose of the hearing was to demonstrate to the trial court that "Cooper's testimony was not scientifically based." In trial counsel's opinion, Cooper's

testimony "was a lot of guess work and it was not based on science." He explained, "It was my belief that [Cooper's] conclusions were not scientifically based, and they weren't something that could be supported through other scientific evidence known to people who investigate arsons."

A series of March 4, 2003 emails between trial counsel and Bayne sent in preparation for the Daubert hearing showed the defense's plan to attack Cooper's testimony. In one email, Bayne told trial counsel:

> Today I re-read Cooper's testimony and have several things to say about Cooper's determination that he saw "pour patterns."
>
> ....
>
> Cooper failed to conduct an adequate fire scene examination according to today's accepted scientific methodology (NFPA 921, 2.1, especially figure 2.3 and specific methodologies mentioned in various chapters and sections)[.]
>
> ....
>
> Cooper's conclusion that pour patterns existed on the living room floor is a conclusion drawn out of context and absent any analysis of: the furniture (what it was made of and what it added to the fuel load; he has no clue what furniture was present, nor how much); what interior surfaces existed (paint, wallpaper, curtains, blinds, fabrics hanging down, ceiling fan, plastic light fixtures in the middle of or around the living room); whether or not the floor was carpeted; what was on the ceiling or walls that could have dropped down; how the concrete wall of the front of the house radiated heat from this fire into spaces where no furniture existed right down to floor level (so the patterns away from the front door area would understandably look irregular).
>
> ....
>
> My literature sources are "NFPA 921", "Kirk's fire investigation (4th edition)" and "Chemical Analysis for the Arson Investigator and Attorney".
>
> ...

NFPA 921 is the one and only document that represents the consensus of the fire investigation community.

In a second email, Bayne wrote that he understood trial counsel wanted him to, <u>inter alia</u>, "provide rebuttal testimony about pour pattern recognition," "provide specific questions to ask Cooper at the pretrial hearing," and "provide input on attacking the science used by Cooper." In a third email, Bayne wrote, "much new evidence has come to light from testing (since 1992) to show that one cannot distinguish pour patterns from other solid-fuel induced patterns by the patterns themselves without incorporating the space, the structure, and the furnishings within the space in question." In the same email, Bayne told trial counsel that the evidence Cooper intended to offer was not generally accepted in the scientific community, "especially since 1992." Bayne wrote that in order to rebut Cooper's testimony regarding the pour pattern, "I will use the most commonly accepted publications in the industry and the best consensus document in the field (NFPA 921)." However, Bayne also cautioned trial counsel that he would "lose this [Daubert] challenge because [Cooper] possesses the credentials on paper."

In a May 16, 2003 document, Bayne recommended that trial counsel ask Cooper "technical questions" related to flashover conditions and effects. Bayne also recommended trial counsel ask Cooper what the "current fire technology journals, books, and other treatises say about the damages inflicted upon wood and carpeted floors at flashover-and during postflashover-condition fires." However, Bayne warned trial counsel that "[t]he problem with this line of questioning is that [Cooper] will be responding as one who has learned much in the 11 years since the fire, when he probably could not have answered these questions adequately in 1993."

In his testimony at the post-conviction hearing, the Petitioner remembered the <u>Daubert</u> hearing being "cut off" with a "hasty ruling" and that all of the questions the defense had planned to ask were not entered into the record. During the hearing, trial counsel did not question Cooper specifically about NFPA 921 or about scientific advances in fire science since the first trial. Trial counsel admitted at the post-conviction hearing that he "was kind of beating around the bush a little bit. I was approaching it a little bit from afar, but I was trying to get to a point where I could convince [the trial court] that, as the gatekeeper of the evidence, he should keep this evidence out." Trial counsel acknowledged that after the trial court's ruling, he did not file an interlocutory appeal, although he could not recall the reason.

In preparation for trial, Bayne sent several emails to trial counsel discussing his

findings regarding the cause of the fire and various strategies for effectively communicating his conclusions at trial. At the post-conviction hearing, Bayne identified an email to trial counsel in which Bayne relayed his belief that flashover occurred. Bayne also identified a document that he prepared titled "Bayne Direct Testimony," which contained proposed questions for his direct examination. Bayne gave several examples of questions on the list that trial counsel did not ask him. Notably, the proposed list of questions for Bayne's direct examination does not contain questions related to NFPA 921 or changes in the understanding of fire science related to pour patterns in the years between the two trials.

Bayne also discussed several excerpts from the 2001 edition of the NFPA 921, which he claimed that he intended to discuss at trial but was not questioned about by trial counsel. Bayne said that one of the excerpts illustrated "graphically how a fire grows and what happens with the influence of radiant heat in pre-flashover conditions, flashover conditions, and post-flashover or full room involvement." Another excerpt showed the "approximate radiant heat flux" required to cause certain burn injuries to human skin.

Bayne also identified an email exchange with trial counsel in which the two discussed what testimony should be elicited through which witnesses. Bayne explained that this email contained information that he did not believe he could testify to at trial because he lacked first-hand knowledge. Bayne intimated that introducing this testimony through other witnesses would connect it to his own testimony. In one email, Bayne instructed trial counsel to ask Cooper about "his uncertainty about the floor burn patterns in the living room," as well as "his respect for NFPA 921."

Bayne stated that he was not present in the courtroom when Cooper testified at trial and that trial counsel did not review Cooper's testimony with him before he testified. Consequently, Bayne could not address particular discrepancies that he had with Cooper's testimony. Trial counsel stated that he may not have asked the trial court to allow Bayne to stay in the courtroom because he "may not have been aware" that experts could be allowed to remain in the courtroom. Bayne, having reviewed Cooper's trial testimony before the post-conviction hearing, said that trial counsel did not adhere to the questions he had advised trial counsel to ask Cooper. Said Bayne: "[Trial counsel] did not follow my lead, the questions were disjointed, and they didn't connect with the path or the line of reasoning that I provided him." Trial counsel, for his part, believed that he had been able to communicate the defense's theory through Bayne's testimony.

*  *  *

At trial, Cooper testified that the fire began in the front room and was deliberately set. He maintained that he had approached his investigation in a scientific manner. Cooper based his conclusions on several observations, including the exclusion of electrical or accidental causes, the burn patterns on the living room floor, the saturation of kerosene in the kitchen, the latched utility room door, and the disabled smoke alarm. Trial counsel asked Cooper to explain flashover, and, after doing so, Cooper admitted that the living room in this case appeared to have been fully involved in fire. He also acknowledged that flashover can occur with or without the use of an accelerant and that radiant heat from flashover can leave burn patterns on the floor. When asked whether he could distinguish between burn patterns caused by radiant heat and those caused through the use of an accelerant, Cooper acknowledged that it can be difficult and that less experienced investigators sometimes mistake the two. However, Cooper maintained that he could tell the difference. Cooper also maintained that he did not base his decision solely on the presence of a pour pattern, but rather took that evidence and combined it with other indicia of arson, such as the kerosene soaked bedspread, the latched door, and the disabled smoke alarm. Cooper was not asked about NFPA 921 or advancements in the scientific community's understanding of fire science in the years between the first and second trials.

Testifying at the post-conviction hearing, Bayne believed that trial counsel did not question Cooper in the manner that Bayne had advised. Bayne stated, "[Trial counsel] did not follow my lead, the questions were disjointed, and they didn't connect with the path or the line of reasoning that I provided him." Bayne also believed that, had he been in the courtroom during Cooper's testimony, he would have been able to address particular discrepancies between the two experts' opinions.

Garrett, 2012 WL 3834898, at **2-4, 6, 9-11, 19.

After reviewing this proof, the Tennessee appellate court concluded that Petitioner's trial counsel was not ineffective in his cross examination of Cooper and that Petitioner failed to establish any prejudice for this claim. The Tennessee appellate court reasoned as follows:

The Petitioner argues on appeal that the current scientific understanding does not support Cooper's testimony and that, through trial counsel's failure to point this out at trial, the jury was left with the impression that the two experts' opinions were

equally weighted. After due consideration, we ultimately cannot agree with the Petitioner's position.

**First, the evidence that the Petitioner submitted at the post-conviction hearing regarding the current scientific understanding of floor burn patterns is not as decisive as he contends**. In this regard, we note that the Petitioner did not admit any portion of NFPA 921, which he purports represents the standard of care in the field. Thus, while the Petitioner complains that Cooper failed to abide by the industry standard, we can only speculate as to exactly what that standard requires. Moreover, Cooper was not presented as a witness at the post-conviction hearing, so we also must speculate as to his familiarity and conformance with NFPA 921. We also note that the post-conviction court found that Lentini's testimony was not relevant specifically to the case at hand. This conclusion diminishes substantially the weight that we afford Lentini's testimony.

**Further, the scientific developments that the Petitioner cites do not necessarily exclude the possibility that Cooper could have reached the conclusion of arson using the methods that he did. Lentini, quoting from the concluding paragraph of a scientific report, stated only that "much more research is needed on the natural variability of burn patterns and damage characteristics and how they are affected by the presence of various accelerants."** The report continued that while "many of the rules of thumb" associated with the use of an accelerant "have been shown not to be true," "[e]xperiments should be designed to put arson investigations on a more solid scientific footing."

**From this testimony, we conclude only that the scientific understanding of burn patterns is evolving and unsettled. More importantly, from the testimony at trial as well as the post-conviction hearing, it is apparent that burn patterns may be left on a floor during a fire either through the use of an accelerant or through radiant heat during flashover (or presumably, both). Critically, neither Bayne's nor Lentini's testimony at the post-conviction hearing negated the possibility that a burn pattern could be left from the ignition of an accelerant.**

**At trial, Cooper repeatedly stated that a burn pattern can be caused by either the ignition of an accelerant or radiant heat**. Cooper believed that the burn patterns in this case were indicative of accelerant use while Bayne believed they were caused by radiant heat. Thus, the two possible interpretations of the burn patterns were presented to the jury even if the fact that the scientific understanding of burn patterns had changed was not. It is true that Cooper maintained that his experience

allowed him to tell the difference between a burn pattern caused by an accelerant versus one caused by radiant heat. **Perhaps trial counsel could have countered Cooper more effectively on this point. We do agree with the Petitioner that evidence of the changing standards in fire investigation methodology, to the extent that they differed from Cooper's methodology, could have helped the Petitioner's case. We, however, do not believe that trial counsel was deficient for failing to elicit such testimony, nor do we believe that a reasonable probability exists that such testimony would have changed the outcome of the trial.**

Trial counsel was not asked at the post-conviction hearing why he chose not to ask Cooper or Bayne about advancements in fire science. However, **there are plausible strategic explanations for trial counsel's decision. In an email sent in preparation for the <u>Daubert</u> hearing, Bayne cautioned trial counsel that in questioning Cooper on his current understanding of fire science, Cooper would be "responding as one who has learned much in the 11 years since the fire." Bayne's concern appears to be borne out in the trial transcript. Cooper readily acknowledged that flashover can create burn patterns and that it appeared to him that the living room underwent flashover. That is, Cooper was aware of the alleged flaw in his methodology. Cooper maintained that, from his experience, and taking all factors into account, he believed that the burn patterns had not been created through flashover. Cooper's apparent knowledge of the subject matter could have led trial counsel to conclude that further examination would not have been helpful to the defense.** In light of these possible strategic choices in this case, we again are mindful that "[j]udicial scrutiny of [an attorney's] performance is highly deferential," <u>Combs v. Coyle</u>, 205 F.3d 269, 278 (6th Cir.2000), and a petitioner alleging deficient performance bears a heavy burden of proving that his or her lawyer's performance was not within the realm of competent trial strategy. See <u>Strickland</u>, 466 U.S. at 689; <u>Tracy F. Leonard v. State</u>, No. M2006–00654–CCA–R3–PC, 2007 WL 1946662, at *20 (Tenn.Crim.App. July 5, 2007).

**Moreover, trial counsel already had subjected Cooper to a thorough, multi-faceted cross-examination of his investigative methodology. This cross-examination highlighted many of the alleged flaws in Cooper's investigation even if the scientific standard from which his investigation deviated was not specifically examined**. As this Court has previously stated, "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." <u>State v. Kerley</u>, 820 S.W.2d 753, 756 (Tenn.Crim.App.1991). **In this Court's opinion on direct appeal, we stated that trial counsel subjected Cooper to a "rigorous" and "artful" cross-examination and that the jury was adequately provided with the defense's theory and given "ample opportunity to reject Mr. Cooper's testimony."** <u>State v. Claude Francis</u>

Garrett, No. M2004–02089–CCA–R3–CD, 2005 WL 3262933, at *17 (Tenn.Crim.App. Dec.1, 2005). We continue to agree with this assessment and decline to find that trial counsel's cross-examination of Cooper was constitutionally deficient.

\* \* \*

We also conclude that the Petitioner did not establish prejudice to his case. Garrett, 2012 WL 3834898, at \*\*20-22 (emphasis altered).

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices

56

made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691. A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000 WL 712376, at *3 (6th Cir. May 23, 2000) (table).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

Given the state court's findings that Petitioner's counsel secured pretrial assistance of an expert and in his cross-examination exposed flaws in the State's experts' testimony, this Court concludes that the State courts reasonably determined this claim to lack merit.

### 2. Petitioner's Trial Counsel's Examination of the Defense Expert

In the second component of this claim, Petitioner contends that his trial counsel did not effectively utilize Stewart Bayne, the defense expert. As the Tennessee appellate court stated:

> In this Court's prior opinion, we summarized the testimony of the defense's expert witness, Stuart Bayne:
>
>> Stewart Bayne testified for the defendant as an expert in fire investigation and fire science. He acknowledged that he did not visit the scene of the fire until after the house had been restored but maintained that he has testified in other cases despite being unable to

personally inspect the fire scene. In the present case, he studied the records from the first trial, interviewed the firefighters, and examined the pictures.

Testifying at trial, Bayne summarized the defense's theory as follows:

> This fire was a Class A fueled with paper and plastic fabrics, accidental naturally growing, meaning unaccelerated by any petroleum compound type fire. Secondly, analysis of the burn patterns on Ms. Lance and Mr. Garrett prove that Ms. Lance and Mr. Garrett were exposed to that fire at the same point in time with the fire as the fire growth. Furthermore, their burn patterns indicate a directional quality to the fire, and a height in the room to the fire. My findings included that this fire was not fueled by kerosene, the point of origin was not on the floor, rather it was in the love seat. And the ignition source was the carelessly dropped cigarette from an intoxicated, wasted as it were, person.

As we stated in our prior opinion:

> Mr. Bayne elaborated that based upon the medical reports, the victim and the defendant sustained burns on their faces and left arms as a result of being exposed to the flames in the living room at the same time. He opined that because the burns were on the upper portions of the victim and the defendant, the fire did not originate in the floor. He believed that the burns on the couple were consistent with them trying to reach the front door and with the defendant's statement to him that, after a night of drinking, the couple returned home and smoked cigarettes, with the victim falling asleep on the love seat and the defendant falling asleep on the couch.

> Mr. Bayne opined that the fuel load in the front room, including the furniture and the wood paneling covering the sheetrock walls, explained the fire growth. He opined that the defendant did not receive his burns from igniting kerosene and that it was "impossible" for the victim to have received her burns from inside the utility room. He dismissed the burn pattern on the front room floor as resulting from radiant heat or "flash over."

58

Mr. Bayne testified that the utility room door edge had scuff marks which indicated that the door stuck in the door frame. He testified that the defendant confirmed to him that the door tended to stick. Mr. Bayne opined that the latch bar was "very carbonized ."

On cross-examination, Mr. Bayne testified that in reaching his conclusions, he ignored Otis Jenkins' claim that the utility room door had been latched. He declined to say how much time elapsed between the deposit of a lit cigarette in the love seat and the onset of a blaze, although he suggested that the process could take minutes or hours. He opined that the presence of the plastic container of kerosene in the kitchen was irrelevant to the cause of the fire. He conjectured that because the container had three holes in the top, the firefighters or investigators could have sloshed some of the kerosene onto the bedspread.

Id. at *8-9.

In addition to these facts, we note that Bayne testified that the alleged area of origin had "a very uniform floor burn pattern indicative of radiant heat and flash over." Regarding the burn injuries to the bodies of the victim and the Petitioner, Bayne disagreed with Dr. Harlan's conclusions. Bayne explained that burn patterns on bodies can tell an investigator about the relative intensity of a fire, the direction of the heat source relative to a person's body, and a fire's developmental timeline. Bayne reviewed the medical records and autopsy in this case, and he compared and analyzed the burn patterns on the victim and the Petitioner. Bayne asserted that the body burns were consistent with the version of events that the Petitioner had relayed to him. He testified that the Petitioner had told him that the Petitioner had awoken to a fire, grabbed the victim's hand, and headed to the front door, exposing their left sides to the fire. At that point, as the Petitioner was attempting to open the front door, the victim retreated into the house. Bayne said that it was "impossible" for the victim to have received her burns in the utility room because the utility room never reached a temperature adequate to deliver the particular types of burns that the victim sustained. Bayne also explained that kerosene is not volatile or flammable like gasoline and will not explode upon ignition. Thus, the Petitioner could not have received his burns by igniting kerosene. After comparing the burn patterns for the jury, Bayne opined that "those two human bodies were standing in the same place at the same time in the relative intensity of the fire, from the growth of the fire."

\*    \*    \*

Trial counsel also testified at the post-conviction hearing. At the time of the hearing, trial counsel had practiced criminal defense law for fifteen years. Trial counsel represented the Petitioner in his prior successful post-conviction proceedings and continued to represent the Petitioner during the second trial. Trial counsel recalled hiring Bayne as an expert in arson investigation to assist the defense in proving that the fire had not been intentionally set. Trial counsel relied on Bayne to assist him in preparing for and examining the State's expert witnesses. He stated that he had "lots of meetings" with Bayne in preparation for trial.

Bayne, who qualified as an expert at the second trial, was also qualified as an expert in fire analysis at the post-conviction hearing. He stated that he first became involved in the case in the fall of 2001. He explained that his role on the defense was to "render an independent origin and cause determination" as to the fire and to offer his analysis at trial. In order to do so, he communicated with trial counsel and the Petitioner, reviewed the case file, and interviewed firefighters who responded to the scene. He explained that all of his efforts were "toward rendering a technically defensible opinion."

Trial counsel planned to use Bayne's expertise to show that flashover had occurred and that the radiant heat caused by flashover had caused the burn patterns on the floor. Trial counsel also intended to use Bayne's testimony regarding the burn patterns on the bodies of the victim and the Petitioner to advance the defense's theory that the two had been in close proximity to one another at some point during the fire.

\*    \*    \*

In preparation for trial, Bayne sent several emails to trial counsel discussing his findings regarding the cause of the fire and various strategies for effectively communicating his conclusions at trial. At the post-conviction hearing, Bayne identified an email to trial counsel in which Bayne relayed his belief that flashover occurred. Bayne also identified a document that he prepared titled "Bayne Direct Testimony," which contained proposed questions for his direct examination. Bayne gave several examples of questions on the list that trial counsel did not ask him. Notably, the proposed list of questions for Bayne's direct examination does not contain questions related to NFPA 921 or changes in the understanding of fire science related to pour patterns in the years between the two trials.

\*    \*    \*

Bayne also identified an email exchange with trial counsel in which the two

discussed what testimony should be elicited through which witnesses. Bayne explained that this email contained information that he did not believe he could testify to at trial because he lacked first-hand knowledge. Bayne intimated that introducing this testimony through other witnesses would connect it to his own testimony. In one email, Bayne instructed trial counsel to ask Cooper about "his uncertainty about the floor burn patterns in the living room," as well as "his respect for NFPA 921."

Bayne stated that he was not present in the courtroom when Cooper testified at trial and that trial counsel did not review Cooper's testimony with him before he testified. Consequently, Bayne could not address particular discrepancies that he had with Cooper's testimony. Trial counsel stated that he may not have asked the trial court to allow Bayne to stay in the courtroom because he "may not have been aware" that experts could be allowed to remain in the courtroom. Bayne, having reviewed Cooper's trial testimony before the post-conviction hearing, said that trial counsel did not adhere to the questions he had advised trial counsel to ask Cooper. Said Bayne: "[Trial counsel] did not follow my lead, the questions were disjointed, and they didn't connect with the path or the line of reasoning that I provided him." Trial counsel, for his part, believed that he had been able to communicate the defense's theory through Bayne's testimony.

\* \* \*

Bayne raised these same concerns with trial counsel prior to trial. In emails, he told trial counsel that "much new evidence has come to light from testing since 1992 to show that one cannot distinguish pour patterns from other solid-fuel induced patterns by the patterns themselves ..." and that the evidence Cooper intended to offer "was not generally accepted in the scientific community, especially since 1992." Bayne informed trial counsel that he intended to use NFPA 921 to rebut Cooper's testimony. He also recommended that trial counsel ask Cooper technical questions related to flashover conditions and effects. In one email, Bayne advised trial counsel to ask Cooper about "his uncertainty about the floor burn patterns" as well as "his respect for NFPA 921." Bayne also warned trial counsel, however, that Cooper would be testifying "as one who has learned much in the 11 years since the fire."

\* \* \*

At the post-conviction hearing, Bayne identified a document that he prepared before trial containing potential questions for his direct examination. Bayne discussed several questions from this list that trial counsel did not ask him at trial. None of the proposed questions related to NFPA 921 or advancements in the understanding of fire science related to pour pattern recognition. Importantly, trial counsel believed

that Bayne successfully communicated the defense's theory of the case at trial. Trial counsel was not asked at the post-conviction hearing why he had not questioned either Cooper or Bayne regarding scientific advancements between trials.

Garrett, 2012 WL 3834898, at **6-7, 9, 11, 19-20.

In assessing this proof, the Tennessee appellate court concluded that Petitioner's counsel's examination of Bayne presented the defense theory that there were alternate causes for the burn patterns.

> Trial counsel was not asked at the post-conviction hearing why he chose not to ask Cooper or Bayne about advancements in fire science. However, there are plausible strategic explanations for trial counsel's decision. In an email sent in preparation for the Daubert hearing, Bayne cautioned trial counsel that in questioning Cooper on his current understanding of fire science, Cooper would be "responding as one who has learned much in the 11 years since the fire." Bayne's concern appears to be borne out in the trial transcript. Cooper readily acknowledged that flashover can create burn patterns and that it appeared to him that the living room underwent flashover. That is, Cooper was aware of the alleged flaw in his methodology. Cooper maintained that, from his experience, and taking all factors into account, he believed that the burn patterns had not been created through flashover. Cooper's apparent knowledge of the subject matter could have led trial counsel to conclude that further examination would not have been helpful to the defense. In light of these possible strategic choices in this case, we again are mindful that "[j]udicial scrutiny of [an attorney's] performance is highly deferential," Combs v. Coyle, 205 F.3d 269, 278 (6th Cir.2000), and a petitioner alleging deficient performance bears a heavy burden of proving that his or her lawyer's performance was not within the realm of competent trial strategy. See Strickland, 466 U.S. at 689; Tracy F. Leonard v. State, No. M2006–00654–CCA–R3–PC, 2007 WL 1946662, at *20 (Tenn.Crim.App. July 5, 2007).

> We likewise conclude that trial counsel did not perform deficiently in his direct examination of Bayne. As noted by the post-conviction court, Bayne communicated to the jury the defense's theory of the case, including his interpretation of the floor burn patterns. Trial counsel hired Bayne to help present a credible, technical defense, and he did so. The fact that trial counsel did not ask particular questions that Bayne requested of him is of limited consequence because, taken as a whole, trial counsel

presented the defense's theory.

The Petitioner cites the Tennessee Supreme Court's decision in State v. Honeycutt, 54 S.W.3d 762 (Tenn.2001) . . . .

\* \* \*

Upon our review of Honeycutt, we conclude that it is distinguishable from the case at hand. Honeycutt involved the complete abandonment of a defense theory supported by credible evidence that a different person had committed the crime. Here, trial counsel developed his theory of defense, i.e., that the fire was accidental. Additionally, trial counsel did not testify that his failure to ask all of the questions prepared by Bayne was not part of a strategic decision. Our review of the record indicates that trial counsel was never asked such a question. The Petitioner essentially complains that trial counsel did not use every bit of evidence at his disposal to discredit the State's theory. We do not read Honeycutt to impose such a standard.

We also conclude that the Petitioner did not establish prejudice to his case. Here again, we note that in both his cross-examination of Cooper and in his examination of Bayne, trial counsel communicated the defense's theory of the case. The jury was made aware that burn patterns can be caused by either the use of an accelerant or radiant heat during flashover. It then became the jury's prerogative to believe one expert's testimony over the other. Most importantly, Cooper repeatedly testified that the burn pattern on the floor was not the only evidence pointing to arson, but that the closed utility room door, the kerosene soaked blanket, and the disabled smoke alarm were also indicative of arson. In light of these facts, we conclude that the lack of further scientific questioning of either Bayne or Cooper does not warrant a finding that trial counsel's performance called into question the reliability of the outcome of the trial. See Pylant, 263 S.W.3d at 869. Thus, we conclude that the Petitioner is not entitled to relief on this issue.

Garrett, 2012 WL 3834898, at \*\*21-22.

Given the Court's conclusions on Petitioner's several claims of ineffective assistance of counsel, the Court further concludes that Petitioner's claims based upon the cumulative effect of counsel's alleged errors lacks merit.

### b. Trial Counsel's Failure to Call Dr. Roth

63

Petitioner asserts that his trial counsel was ineffective for failing to call Dr. Roth as a defense witness at trial because Dr. Roth "would have provided independent corroboration of the defense's theory that the victim and the Petitioner were situated similarly during the fire based on the similarity of their burn injuries." Garrett, 2012 WL 3834898, at *23. The facts on this claim are as follows:

> The Petitioner also claimed in his petition that trial counsel performed ineffectively by failing to call his treating physician, Dr. Robert Roth, as a witness at trial. At the postconviction hearing, trial counsel acknowledged that Bayne was "consistent and persistent" in his argument that the patterns of the burn injuries on the bodies of the victim and the Petitioner "were an important piece of evidence." Trial counsel explained that Bayne's investigation supported the theory that the Petitioner and the victim had been "at some point in the fire in close proximity with one another because they both had similar burns on them." Trial counsel identified his own handwritten note, written in preparation for the trial, in which he stated that "Mr. Bayne can testify with 99% certainty that the defendant and the victim received the same damaging exposure to heat from the same fire, at the same time, same direction." In a subsequent email, Bayne told trial counsel that the victim could not have received such burns in the utility room because the burns resulted from "fire/radiant heat generated by fire." In another email to trial counsel, Bayne wrote:

>> I really think that the burn patterns that were observed, described, and pictured on [the Petitioner and the victim] are very important because they match almost to the "T". I mean, really important. One cannot produce the same relative patterns and intensity on two people's bodies unless those two people were in the same relative location and exposed to the same heat flux at the same point in time.

> In Bayne's view, Dr. Roth, who treated both the Petitioner and the victim at the hospital, was an important defense witness because he could corroborate Bayne's opinion regarding the body burns. In an email, Bayne wrote to trial counsel, "Dr. R.M. Roth: treated defendant at the hospital; is an important witness for us. He can reinforce what I want to opine, namely that the two sets of burn patterns on the defendant and the victim came from the same direction, intensity, and moment in time."

> Trial counsel identified a subpoena that was issued and served upon Dr. Roth. Trial

counsel could not remember why he did not call Dr. Roth. He indicated that the reason may have been that the same evidence had been introduced through the testimony of the State's medical examiner, Dr. Harlan. When asked whether Dr. Harlan's testimony that the victim could have received her burns while in the utility room advanced the defense's theory, trial counsel acknowledged that it did not. On cross-examination, trial counsel stated that he did not recall why he did not call Dr. Roth but that he "made some kind of decision at the time that I didn't feel he was necessary."

The Petitioner testified that he understood Dr. Roth's testimony was intended to support Bayne's opinion about the burns on the Petitioner's and the victim's bodies. The Petitioner testified that trial counsel did not tell him why he did not call Dr. Roth. On redirect, trial counsel was asked, "If Mr. Bayne had told you that Dr. Roth was a necessary witness, would you have followed him based on his expertise and called him?" Trial counsel replied that he did not remember Bayne's telling him that, "but if he did, I probably should have heeded his words."

Bayne testified that his understanding of the importance of Dr. Roth's testimony was to "offset Dr. Harlan." Bayne believed that Dr. Harlan "was going to testify ... that [the victim] received her burns while she was in the utility room," which Bayne asserted was not possible. Bayne said that he expected Dr. Roth to testify at trial that the burns the doctor observed on both the victim and the Petitioner were "approximately equal in intensity, depth of char, and body location between the two different bodies." Bayne believed that the similarity of the burn patterns caused the "State's case to fail." Bayne said that he had expressed the critical importance of this evidence to trial counsel for eighteen months prior to trial. Bayne was surprised when he learned that trial counsel had released Dr. Roth without calling him to testify. Bayne could not remember whether trial counsel explained to him his decision to release Dr. Roth. Bayne guessed that trial counsel had told him that he already had introduced the evidence he needed, and therefore, he did not need Dr. Roth's testimony.

Dr. Roth testified at the post-conviction hearing. He stated that he was the emergency room physician who treated both the victim and the Petitioner on the night of the fire. Dr. Roth indicated that the victim had burns on her face, abdomen, hands, arms, and neck. He could not recall whether she had burns on her legs. Dr. Roth testified that the Petitioner had singed hair, eyebrows, and hands, as well as second degree burns on his left biceps and the dorsum of his left hand. **Dr. Roth acknowledged that the locations of the burns on the victim and the Petitioner were "similar in pattern." He also acknowledged that the burns were consistent with "exposure to a very**

intense heat source" and said that "they were both exposed to similar amounts of heat causing types of destruction." **Dr. Roth could not testify whether the burns were consistent with the victim and the Petitioner moving at the time of exposure or with their exposure to the same heat source at the same time.**

Dr. Roth vaguely recalled being subpoenaed to testify in this case and stated that he had been available to testify. **On cross-examination, he stated that, had he been called to testify at the trial in 2003, his testimony would have been the same as it had been at the postconviction hearing.**

Garrett, 2012 WL 3834898, at **12-13 (emphasis added).

The State trial and appellate courts rejected the Roth claim, reasoning that Petitioner failed

to prove the requisite prejudice:

> **The post-conviction court determined that the Petitioner was not prejudiced by trial counsel's failure to call Dr. Roth because testimony about the similarity of the burn patterns already had been elicited from Bayne and Dr. Harlan. We agree.** Trial counsel presented evidence to the jury regarding the similarity of the burn injuries and the importance of the injuries to the defense's theory through the testimony of Bayne. While testimony from Dr. Roth regarding the burn injuries would have corroborated Bayne's testimony, the failure to adduce such additional testimony did not prejudice the Petitioner because the testimony would have been merely cumulative. Moreover, at the post-conviction hearing, **Dr. Roth testified only that the burn patterns were similar and indicative of exposure to a very intense heat source. He could not opine whether the burns were consistent with the victim and the Petitioner's exposure to the same heat source at the same time. Thus, Dr. Roth's testimony was of limited corroborative value and would not have affected the outcome of the trial. Accordingly, we agree with the post-conviction court's determination that the Petitioner failed to show he was prejudiced by trial counsel's failure to call Dr. Roth as a witness at trial.**

Id. at *23 (emphasis added).

Given that Dr. Roth testified at the second post-conviction hearing that he could not opine

on the consistency of the victim's and Petitioner's burns, this Court concludes that the State courts

could reasonably find Petitioner failed to prove the required prejudice under <u>Strickland</u> for this claim.

### c. Trial Counsel's Failure to Move for a Mistrial

For his next claim, Petitioner argues that despite three references by State witnesses to his prior trial during testimony at his second trial, his trial counsel did not move for a mistrial. The State courts rejected this claim for lack of proof of prejudice:

> Finally, the Petitioner argues that trial counsel was ineffective for failing to move for a mistrial on any of the three occasions when the Petitioner's first trial was referenced by the State or the State's witnesses. The State argues that the Petitioner has waived the issue by failing to present it in his post-conviction petition or at the evidentiary hearing.

> Prior to the start of the second trial, both parties addressed the trial court and agreed that the parties and witnesses should abstain from referring to the first trial so as not to inform the jury that a prior trial had taken place. Accordingly, the parties agreed to refer to the prior trial as a "prior proceeding." However, during the trial, two of the State's witnesses, as well as the prosecutor in closing arguments, nevertheless, referred to the prior trial.

> The first reference occurred when the prosecutor asked Captain Jenkins whether he had previously seen certain photographs of the fire scene. Captain Jenkins replied that he had been "shown photographs at the previous trial." Trial counsel approached the bench and asked the trial court to "quietly suggest to this witness that he should not refer to the prior proceeding as a trial." The trial court agreed to do so, and the witness complied.

> The second reference came when trial counsel asked Cooper on cross-examination whether he recalled his previous testimony on a particular question. As part of his answer, Cooper replied, "If that question was asked during the other trial—other proceeding—[.]" Trial counsel then interrupted Cooper's response by reading the prior question from the trial transcript. Trial counsel did not object or request a curative instruction.

The third reference came during closing arguments when the prosecutor told the jury, "I think smoke snuffed out the life of Lori Lance back in '92, and I think smoke created by Claude Garrett took her from us long before her time. I think smoke created by Claude Garrett filled that whole house on Broadway and brought us to this courtroom back in 1992." Again, trial counsel did not object or request a curative instruction.

Trial counsel did not move for a mistrial following any of these references to the prior trial. Additionally, while counsel attempted to raise the issue on appeal, he failed to include the issue in a motion for new trial. Consequently, in our prior opinion on direct appeal, this Court deemed the issue to have been waived. See Claude Francis Garrett, 2005 WL 326933, at *28.

Testifying at the post-conviction hearing, trial counsel recalled entering an agreement with the prosecutor to refrain from mentioning the previous trial. He recalled only one of the State's witnesses referring to the prior trial but allowed that others may have also done so. Trial counsel remembered objecting to this reference, but could not recall whether he raised the issue in the motion for new trial or on appeal.

Contrary to the State's position on appeal, while the Petitioner's amended petition seeking post-conviction relief did not raise the issue, his original pro se petition, in fact, did raise this issue. Likewise, the Petitioner adduced some limited proof on this issue at the evidentiary hearing. Thus, we cannot agree with the State that the issue has been waived.

However, the post-conviction court's written order denying post-conviction relief does not contain findings of fact or conclusions of law on this particular issue. As noted above, a post-conviction court is required to enter written findings of fact and conclusions of law addressing all grounds for relief following a post-conviction hearing. See Tenn.Code Ann. § 40–30–111(b) (2003); Tenn. R.S.Ct. 28, § 9(A). However, because written findings are intended to facilitate appellate review, when the record is adequate, we nevertheless may review the case even without such findings. See State v. Swanson, 680 S.W.2d 487, 489 (Tenn.Crim.App.1984). In this case, we are provided with the trial transcript, which contains the factual basis for the Petitioner's claims, as well as the post-conviction court's conclusion that the Petitioner failed to show deficient performance and prejudice to his case. Thus, we conclude that the record is sufficient for appellate review and deem it unnecessary to reverse the post-conviction court in order for that court to make findings of fact and conclusions of law with respect to this issue.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. Arnold v. State, 563 S.W.2d 792, 794 (Tenn.Crim.App.1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn.Crim.App.1994). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn.Crim.App.1991) (quoting Arnold, 563 S.W.2d at 794). The decision whether to grant a mistrial is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. Id.

In our view, the record does not demonstrate any material prejudice to the Petitioner's case. After Captain Jenkins referred to the prior trial, trial counsel asked the court to instruct the witness to refrain from referring to it as such. When Cooper referred to the prior trial, he immediately corrected himself by saying, "prior proceeding." The prosecutor's remarks during closing arguments, while unnecessary, were somewhat vague. Although it would have been appropriate for trial counsel to have sought a curative instruction following any of these references, it is highly unlikely that a mistrial would have been granted. Moreover, trial counsel could well have believed it to be a better trial strategy to let these references, slight as they were, pass by without further attention. The references by the State and the State's witnesses simply did not give rise to a "manifest necessity" to stop the trial. Consequently, the Petitioner is not entitled to relief on this issue.

Garrett, 2012 WL 3834898, at **23-25.

The Court concludes that given the State's proof, the State courts could reasonably determine that these three references to Petitioner's prior trial were not prejudicial and Petitioner's trial counsel's failure to move for a mistrial does not constitute ineffective assistance of counsel due to the lack of any prejudice.

### 6. Defaulted Claims

Of Petitioner's remaining claims, Respondent identifies the following as procedurally defaulted:

Claim 2 – Ineffective assistance of counsel.

* * *

C. Counsel failed to challenge on direct appeal the factual basis underlying the evidence presented by James Cooper.

* * *

F. Counsel failed to . . . move for an interlocutory appeal.

G. Counsel failed to allow the petitioner to testify.

H. Cumulative effect of counsel's alleged errors.

Claim 3 – The petitioner received ineffective assistance of counsel during post-conviction proceedings.

A. Counsel failed to move into evidence multiple editions of the National Fire Protection Association's Guide for Fire and Explosion Investigations.

B. Counsel failed to raise meritorious issues of prior ineffective assistance of counsel.

Claim 7 – Ineffective assistance of appellate counsel stemming from counsel's failure to raise meritorious claims including claim of ineffective-assistance of trial counsel.

(Docket Entry No. 20, Response at 4).

To present these claims, Petitioner relies upon Martinez that created an equitable exception to the procedural default rule. In a word, Martinez, "qualifies Coleman[ v. Thompson, 501 U.S. 722 (1992)] **by recognizing a narrow exception**: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of

ineffective assistance at trial." 132 S. Ct. at 1315 (emphasis added). In addition, Martinez applies to "initial-review collateral proceedings", "which provide the first occasion to raise a claim of ineffective assistance at trial." Id. See also Trevino v. Thaler, __ U.S.__, 133 S. Ct. 1911 (2013).

"To be successful under Trevino, . . . [the habeas petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim. McGuire v. Warden, Chillicothe Correctional Inst.738 F.3d 741, 752 (6th Cir. 2013) (citing Trevino, 133 S.Ct. at 1918). "The holding in [Martinez] does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." Martinez, 132 S.Ct. at 1320. Thus, under Trevino and McGuire, Petitioner's Martinez claims must be "substantial." McGuire, 738 F.3d at 752 (quoting Trevino, 133 S. Ct. at 1918).

As a threshold issue, the Court adopts its rationale in Middlebrooks v. Colson, No. 3:03-00814, 2014 WL 3817238, at *8 (M.D. Tenn. Aug. 1, 2014), that Tennessee's statue of limitations qualifies for invocation of the procedural default doctrine.

Petitioner's defaulted claims are new alternate theories about his counsel. As to the defaulted claims about his counsel, for the reasons stated in Petitioner's exhausted claims, the Court concludes that Petitioner's unexhausted claims about his trial counsel lack merit and are not substantial claims required by Martinez. As quoted, supra at 17, the trial court voir dired Petitioner on his right to

71

testify and Petitioner decided not to testify. As to unexhausted claims about Petitioner's appellate counsel, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). Petitioner's claim about counsel's failure to pursue an interlocutory appeal on the admission of Cooper's testimony, fails for lack of prejudice because on the post-conviction appeal, the Tennessee appellate court found Cooper's testimony admissible. As to appellate counsel's failure to include the new science data in the appellate record, Bayne quoted the relevant National Science standards in his testimony rendering harmless any failure to file the entire text. Given the absence of a single deficiency of counsel's performance, any claim based on cumulative alleged errors is not a substantial claim.

For these collective reasons, the Court concludes that the petition should be denied and this action dismissed with prejudice.

An appropriate Order is filed herewith.

**ENTERED** this the ___2/8___ day of March, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge